*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0264P (6th Cir.)
File Name: 04a0264p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

KATHERINE REYNOLDS,
        *Plaintiff-Appellant,*

*v.*

CITY OF ANCHORAGE, et al.,
        *Defendants,*

LESLIE WATSON, Jefferson
County Officer,
        *Defendant-Appellee.*

No. 02-6443

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 97-00446—John G. Heyburn II, Chief District Judge.

Argued: March 12, 2004

Decided and Filed: August 9, 2004

Before: NELSON, MOORE, and FRIEDMAN, Circuit
Judges.[*]

—————————

[*]Daniel M. Friedman, Circuit Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

—————————

## COUNSEL

**ARGUED:** David A. Friedman, FERNANDEZ, FRIEDMAN, GROSSMAN & KOHN, Louisville, Kentucky, for Appellant. Suzanne D. Cordery, JEFFERSON COUNTY ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellee. **ON BRIEF:** David A. Friedman, FERNANDEZ, FRIEDMAN, GROSSMAN & KOHN, Louisville, Kentucky, for Appellant. David L. Leightty, LEIGHTTY & ASSOCIATES, Louisville, Kentucky, for Appellee.

FRIEDMAN, J., delivered the opinion of the court, in which NELSON, J., joined. MOORE, J. (pp. 17-26), delivered a separate dissenting opinion.

—————————

## OPINION

—————————

FRIEDMAN, Circuit Judge. This appeal challenges a district court's summary judgment dismissing a suit under 42 U.S.C. § 1983 (1994) against a female police officer who made a warrantless strip search of a female resident in a children's home. The resident had been placed there following a juvenile court determination that she had committed various offenses. The district court dismissed her suit because it ruled that the police officer had qualified immunity. We affirm.

I

The "basic underlying facts" are, as the district court stated, "undisputed." Mem. Op. at 1.

In 1996, a Kentucky juvenile court found that the appellant Katherine Reynolds, then sixteen years old, had committed the offenses of possession of marijuana, forgery, and

fraudulent use of a credit card. As a result, she was removed from her parents custody and was placed in the Bellewood Presbyterian Home for Children ("the Bellewood Home"), a state-approved private facility for juvenile offenders. While there, she, together with several other girls, lived in Haney Cottage. Haney Cottage residents, including Reynolds, "admitted having previously used drugs while living" there. *Id.*

On June 8, 1997, Reynolds (then seventeen) and two other Haney residents walked around the facility's grounds. Upon their return, two staff members observed that the girls were "acting strangely" and suspected drug use might be the reason. *Id.* at 2. At that same time, a local police officer of the city of Anchorage, Kentucky, who was passing Bellewood in his patrol car, telephoned the staff members to "make sure everything was alright," *id.*, and to "say hi." The staff members told the officer about their suspicions that the girls "might be under the influence of drugs and might have drugs in their possession." *Id.* The officer, joined by another local officer, proceeded to Haney Cottage "to assess the situation." *Id.*

After the girls, including Reynolds, were placed in the cottage's living room and instructed to stay there in the charge of a staff member, the police officers and the other staff member searched the girls' rooms. In Reynold's room they found "a plastic baggy . . . which the officers believed may have contained drugs." *Id.* In other rooms, the officers found "a baggy with a plant substance residue the officers thought might be marijuana, . . . a glass vial which the officers believed may have been used as a pipe," and "prescription pills"– all items the officers "believed to be associated with drug use." *Id.*

"At some point, [Reynolds] insinuated to the staff members and the officers that she might have drugs hidden in her undergarments. [Reynolds'] statements coupled with the suspicious items located in the girls' rooms and their strange

behavior convinced the officers that the girls needed to be searched to ensure that there were no drugs in the cottage." *Id.* Because the officers were all male, they called the county police department to send a female officer to conduct the searches. The department sent the appellee, Officer Leslie Watson, to perform the task. As the district court stated:

> Upon her arrival, [Watson] observed the girls running throughout the cottage, playing loud music, and yelling. The Anchorage officers said that they had searched the girls' rooms and located what they believed to be drug paraphernalia. She was also informed that the officers suspected that the girls might be harboring drugs in their undergarments or other clothing. [Watson] indicated that she could not perform a body cavity search without a warrant, but that she would perform a visual strip search of the girls to look for drugs.
>
> [Watson] conducted the searches one at a time. Each girl was searched in her own room with a female staff member present. [Watson] instructed each girl to first to remove her blouse and bra, put them back on, and then to remove her bottom clothing and underwear and bend over to allow a visual inspection of her rectal area. [Watson] never physically touched any of the girls during the searches. No drugs were located on any of the girls during the strip searches.

*Id.* at 3.

Reynolds then filed in the United States District Court for the Western District of Kentucky the present suit under 42 U.S.C. § 1983 against the City of Anchorage, its Chief of Police, and the police officers involved. She sought injunctive and declaratory relief, and compensatory, exemplary, and punitive damages. All defendants except Watson settled.

On cross-motions for summary judgment, the district court granted Watson's motion, ruling that she had qualified immunity. The court

> conclude[d] that in 1997 it was not clearly established that a search warrant supported by probable cause was required to constitutionally conduct a strip search of a minor suspected of possessing drugs in a juvenile home or detention center. Based on the particular facts, and in light of the then existing case law to guide [Watson], the Court conclude[d] that the type and scope of the search performed on [Reynolds] were objectively reasonable. Therefore, [Watson] [wa]s qualifiedly immune from suit under 42 U.S.C. § 1983.

*Id.* at 11-12.

## II

In its most recent qualified immunity decision, the Supreme Court stated that a court determining "a qualified immunity defense" in "a suit against an officer for an alleged violation of a constitutional right," must make two inquiries. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). First, the "court . . . must consider . . . this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. "[S]econd, assuming the violation is established, the question whether the right was clearly established must be considered . . . . " *Id.* at 200. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* at 201.

We therefore shall consider whether Officer Watson's strip search of Reynolds violated the Fourth Amendment and

whether Officer Watson had qualified immunity in making the search. *See, e.g., Akers v. McGinnis*, 352 F.3d 1030, 1042 (6th Cir. 2003); *Greene v. Barber*, 310 F.3d 889, 894 (6th Cir. 2002). In *Virgili v. Gilbert*, 272 F.3d 391, 394 (6th Cir. 2001), however, decided after *Saucier*, this court, after holding that state prison employees had qualified immunity for strip searching another prison employee, stated: "We need not and do not, opine on the Fourth Amendment standards to be applied to strip-searches of prison employees."

A.    The application of the Fourth Amendment to warrantless strip searches has been developed largely in cases involving such searches in prisons and in schools. In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court held that visual body cavity inspections during strip searches of pre-trial detainees and convicted prisoners after they had contact with outsiders were not "unreasonable" searches under the Fourth Amendment. The searches were conducted at the "federally operated short-term custodial facility in New York City designed primarily to house pretrial detainees." *Id.* at 523. The Court stated that applying "[t]he test of reasonableness under the Fourth Amendment . . . [i]n each case . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559. It pointed out that a "detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Id.*

In *Dobrowolskyj v. Jefferson County*, 823 F.2d 955 (6th Cir. 1987), this court held that under *Wolfish*'s balancing analysis, the strip search of a detainee in a local jail pursuant to a policy of so searching detainees before moving them into an area of the jail where they would have contact with the general prison population, was not an unreasonable search and therefore did not violate the Fourth Amendment. The

court stated: "The security interests of the jail in conducting a search at this point were strong. Dobrowolskyj was about to come into direct contact with the general jail population, including prisoners who would then be moved into all sections of the jail. The jail had legitimate interests in preventing the flow of contraband into the other sections of the jail." *Id.* at 959.

*Griffin v. Wisconsin*, 483 U.S. 868 (1987), although involving a different issue, provides further guidance. The question there was whether a probation officer's warrantless search of a probationer's home, pursuant to a state regulation authorizing such search if there were "reasonable grounds" to believe that contraband was present there, violated the Fourth Amendment. *Id.* at 870-71. The search was made after the police had told the probation department that "there were or might be guns" in the probationer's apartment. *Id.* at 871. The search uncovered a handgun in the apartment. The Court held that "[t]he search of [the probationer's] residence was 'reasonable' within the meaning of the Fourth Amendment because it was conducted pursuant to a valid regulation governing probationers." *Id.* at 880.

The Court indicated that "[a] warrant requirement would interfere to an appreciable degree with the probation system," *id.* at 876, and that "the probation regime would also be unduly disrupted by a requirement of probable cause," *id.* at 878. It stated: "In such circumstances it is both unrealistic and destructive of the whole object of the continuing probation relationship to insist upon the same degree of demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts. In some cases – especially those involving drugs or illegal weapons – the probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a probationer does damage to himself or society." *Id.* at 879.

Cases involving searches of students by school authorities also are instructive. In *New Jersey v. T. L. O.*, a school principal searched a student's purse after a teacher found the student smoking in the restroom, in violation of school rules. 469 U.S. 325, 328 (1985). The Court held that the search was reasonable. After noting that the Fourth Amendment "applies to searches conducted by public school officials," *id.* at 333, the Court stated that "school officials need not obtain a warrant before searching a student who is under their authority," *id.* at 340. It stated that "the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search. . . . Under ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 341-42 (footnotes omitted).

This court applied the *T.L.O.* resonableness analysis to a warrantless strip search for drugs conducted by school officials in *Williams v. Ellington*, 936 F.2d 881 (6th Cir. 1991). There a female student reported to the principal (Ellington) that Williams and another girl had used drugs at school; there was other evidence that supported that conclusion. After a search of William's locker, books and purse produced no evidence of drugs, the principal asked a female assistant principal to strip search Williams, which she did. *Id.* at 883. No drugs were found.

Williams then filed suit under 42 U.S.C. § 1983 against school officials (including the principal and the assistant principal who conducted the strip search) and the school board members. This court affirmed the district court's summary judgment for the defendants. *Id.* at 889. It held that the defendants had qualified immunity. *Id.* This court stated:

> Ellington's decision to search Williams and her possessions for the presence of drugs was based upon the events that occurred during the week of January 17, 1988. A study of the record leads us to conclude that Ellington and the remaining Defendants were not unreasonable in suspecting, based on the information available at the time, that a search of Williams would reveal evidence of drugs or drug use. Further, Defendants were not unreasonable, in light of the item sought (a small vial containing suspected narcotics), in conducting a search so personally intrusive in nature.

*Id.* at 887

In *Tarter v. Raybuck*, 742 F.2d 977, 983 (6th Cir. 1984), this court held that school officials had made a reasonable search of a student's person (although he did not remove all of his clothing) where they "had observed activity they reasonably believed to indicate the use and sale of marijuana, activity which plainly constituted a violation of a well established policy." This court stated that in determining whether the search was reasonable, "we balance the [F]ourth [A]mendment rights of individual students with the interest of the state and the school officials in the maintenance of a proper educational environment to educate today's youth." *Id.* at 982. It "h[e]ld that a school official or teacher's reasonable search of a student's person does not violate the student's [F]ourth [A]mendment rights, if the school official has reasonable cause to believe the search is necessary in the furtherance of maintaining school discipline and order, or his duty to maintain a safe environment conducive to education." *Id.*

B. Under the foregoing decisions, the determination of the reasonableness under the Fourth Amendment of a strip search of a juvenile delinquent in a detention facility requires us to balance "the need for the particular search against the invasion of personal rights that the search entails." *Wolfish*, 441 U.S. at 559.

The situation of the juvenile delinquent inmates of the Bellewood Home lay somewhere between that of prison inmates and students in school. The Bellewood inmates were not as closely confined or strictly controlled and supervised as prison inmates or detainees. Perhaps their expectations of privacy in that situation were somewhat greater than those of prisoners, but this slight difference appears insignificant. On the other hand, they were still subject to substantial restraint; they were required to live and remain in the Home and they were not free to leave it as they wished. Their confinement to the Home, like that of inmates in a prison, was punishment for prior criminal misdeeds. In comparison to students in school, whose mandatory attendance is not punishment for criminal misconduct but a method of insuring their education, the inmates of the Home were under substantially greater restraint and had a lesser expectation of privacy than do students.

Applying this balancing approach, we conclude that Officer Watson's strip search of Reynolds was not unreasonable. In so concluding, we apply *Wolfish*'s admonition to "consider the scope of the particular intrusion, the manner in which it [was] conducted, the justification for initiating it, and the place in which it [was] conducted." *Id. Wolfish* also pointed out that a "detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Id.* The Bellewood Home also was "a unique place fraught with" a variety of problems and dangers, including the use of drugs by its residents. The need to "maintain[] . . . discipline and order" there is no less than in school. *Tarter*, 742 F.2d at 982.

Following the determination by the juvenile court that Reynolds had committed three criminal offenses, including possession of marijuana, the court removed her from her parents' custody and placed her in the Bellewood Home, which thereby became her new "home." The Bellewood Home had the duty and responsibility to insure the safety, health, and well being of Reynolds and the other inmates. The use and/or possession of drugs by Reynolds or the other girls would cause serious problems within the Bellewood Home and adversely affect its proper functioning. The Home thus had a strong interest in eliminating and preventing drug use on the premises by its residents.

Watson and other girls admitted they previously had used drugs while living in the Home. They had acted "strangely" after returning from a walk, which led staff members to suspect the use of drugs. A search of their rooms by the police officers had uncovered paraphernalia that the officers "believed to be associated with drugs use." Mem. Op. at 2. Reynolds had insinuated that she had drugs hidden in her underwear. The police officers justifiably concluded that the only way to assuage these concerns about the girls' possession of drugs "and to ensure that there were no drugs in the cottage" was to strip search the girls. *Id.*

Although the strip search was a highly invasive procedure, it was no more invasive than necessary to accomplish its purpose of insuring that Reynolds and the other girls were not concealing drugs on their persons. It was conducted in a way designed to minimize its intrusive effect. Officer Watson made the search in the privacy of the girls' own rooms and in the presence of only a single staff member. She did not touch any of the girls during the search. Considering all the circumstances, we conclude that Officer Watson's strip search of Reynolds was not unreasonable.

Reynolds continues to rely heavily here, as she did in the district court, on this court's unpublished opinion in *Toles v. Friedman*, No. 99-4031, 2000 WL 1871683 (6th Cir. Dec 11,

2000). As the district court correctly stated, however, the "circumstances" in the present case "are significantly different from those in *Toles*." Mem. Op. at 6.

In *Toles*, three girls had spent some time trying on bathing suits in a department store but did not purchase any. A clerk, suspicious because of the length of time the girls were in the dressing room, called the defendant Friedman, an off-duty police officer who was doing security work for the store. When the girls were about to leave the store, Friedman stopped them. After searching their purses and finding nothing, he suspected that they might be concealing a bathing suit under their outer clothing. Friedman arranged for a female security guard at the mall where the store was located to strip search the girls. She did so but did not find a bathing suit.

The girls sued Friedman, who claimed qualified immunity. The district court refused to grant such immunity, finding there were disputed factual issues. Friedman appealed to this court only from the denial of qualified immunity.

We dismissed the appeal for lack of jurisdiction because an order denying qualified immunity due to the presence of a disputed issue of material fact is not immediately appealable. We held that there was such an issue: whether the girls consented to the strip search. We ruled that "a reasonable law enforcement officer, in the circumstances presented, could not believe that exigent circumstances justified the warrantless strip searches of the young women," and that "the only possible exception to the warrant requirement that could have validated the presumptively unreasonable, warrantless search was a search undertaken pursuant to the consent of the plaintiffs." *Id.* at **4. We concluded that "[t]he existence of that unresolved factual dispute preclude[d] this court from exercising jurisdiction over this appeal at this time." *Id.* at ** 5.

In *Toles*, the defendant sought to justify the strip search on the basis of exigent circumstances, an exception to the warrant requirement not involved here. *Toles* arose in the commercial context of a suspected theft by customers in a department store – a situation totally unlike the suspected use of drugs by a juvenile delinquent in a children's home.

C.  Should the analysis or result be different because the strip search was conducted by a police officer rather than by an employee of the Bellewood Home?  We think not.

As Reynolds points out, the cases we have discussed in Part II.A that formulate and apply the balancing test in determining the Fourth Amendment reasonableness of strip searches involved searches by persons other than police officers.  It does not follow, however, that those principles cannot properly be applied where the strip search is made by a police officer.  Those cases do not state that their principles are inapplicable to strip searches by police officers.

The inquiry in those cases focused on balancing "the need for the particular [strip] search against the invasion of personal rights that the search entails," *Wolfish*, 441 U.S. at 559, not on the identity of the person conducting the search.  As we have shown, under that balancing test the strip search of Reynolds would have been reasonable if the staff members of the Bellewood Home had conducted it.  We see no valid reason why the result should be different because it was a police officer who conducted the search.  In either instance, the purpose and objective of the search was the same:  to help the Home determine whether the girls possessed drugs, and thus to aid the Home in uncovering what the facts suggested may have been the illegal use of drugs by some of the residents.

The district court concluded that, based on the facts known to Officer Watson, described above,

it was not unreasonable for [Watson] to conclude that a search was necessary both to ensure [Reynolds'] safety and the safety of the other residents.  Thus, it was objectively reasonable for [Watson] to conclude that interests apart from those of ordinary law enforcement permitted her to conduct a warrantless strip search of [Reynolds].

Mem. Op. at 11.

On this record, we have no reason to disagree with or reject those conclusions.  Under them, the search did not require a warrant even though conducted by a police officer.  It was reasonable because Officer Watson had a reasonable suspicion that the girls possessed narcotics. *Cf. United States v. Knights*, 534 U.S. 112, 121 (2001) ("When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.").

III

Even if our conclusion that the strip search did not violate the Fourth Amendment were to be rejected, we still would affirm the district court's summary judgment for Officer Watson dismissing the complaint.  That is because we agree with the district court that Officer Watson had qualified immunity for conducting the search.

The Supreme Court has explained that

[t]he concern of the [qualified] immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.  It is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.  An officer might

correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Saucier*, 533 U.S. at 205.

Under qualified immunity, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *See also Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (In damage suit against former Attorney General Mitchell for authorizing a wiretap, "[u]nder *Harlow v. Fitzgerald*, Mitchell [was] immune unless his actions violated clearly established law."). This court has stated that "[t]o determine what rights are 'clearly established,' we must look to decisions from the Supreme Court and from courts within this circuit," although "[i]n rare instances, where authority is lacking from these sources, we may also review decisions of other courts." *Williams v. Ellington*, 936 F.2d at 885.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The district court correctly concluded that when Officer Watson conducted the strip searches in 1997, it was not clearly established that those searches were unlawful and that it would not have been clear to her that her conduct was unlawful.

There has been no decision of the Supreme Court, this court or any courts within this circuit – or, as far as we know, of any other court – that has addressed the application of the

Fourth Amendment to strip searches of juvenile delinquents in an institutional home in which they are confined. Moreover, as is shown by the analysis, in Part II above, of existing precedent that deals with the Fourth Amendment status of strip searches in other contexts, the question is close and difficult. It involves subtle legal distinctions and inferences that a reasonable police officer would not and could not be expected to make.

In these circumstances, any mistake that Officer Watson may have made about her authority to conduct the strip searches was reasonable. It cannot be said that at that time it was clearly established that Reynolds had a constitutional right not to be so searched except pursuant to a valid search warrant.

Officer Watson was aware of and sensitive to the existing settled limits upon her authority to make strip searches. As the district court noted, upon arriving at the Bellewood Home, she "indicated that she could not perform a body cavity search without a warrant, but that she would perform a visual strip search of the girls to look for drugs." Mem. Op. at 3. Even if she were mistaken in concluding that she could make a warrantless visual strip search, such mistake was reasonable.

## CONCLUSION

The summary judgment of the district court in favor of Officer Watson is affirmed.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting. In holding that Officer Watson's warrantless strip-search of a seventeen-year-old girl was "reasonable" under the Fourth Amendment, the district court relied on the "special needs" exception to the rule that all warrantless searches are presumptively unreasonable. In affirming that dubious holding, the majority untethers the district court's language from its reasoning, and in a single paragraph of analysis, relies on *United States v. Knights*, 534 U.S. 112, 121 (2001), to conclude that "reasonable suspicion" is all that is necessary to justify a strip-search of a juvenile in a private group home by police acting without authorization from that home's staff. I believe the district court was wrong to conclude that this was a valid "special needs" search, I believe the majority is wrong to rely on *Knights* rather than the general rule that a warrantless search is presumptively unreasonable unless falling into an enumerated exception, and I believe that even under the balancing test used in *Knights*, this search was unreasonable.

The majority relies upon the district court's recitation of facts, and in doing so amplifies the district court's errors. The "basic underlying facts" are not "undisputed"; a thorough review of the record reveals that the version of events given by the police officers in their deposition testimony and written reports and that of the staff of the Bellewood home and its residents are wildly divergent. *Compare* Dep. of Officer Watson, R. 119, at 32 ("I tried to do it [the strip-searches] as gently as possible and considerate as possible") *with* Dep. of Katherine Reynolds, R. 92, at 157 ("And then [Watson] said, "If you don't take off the f***ing bra, I'm going to take it off for you.") *and* Dep. of Sarah Lynette Holman, R. 101, at 44-45 (describing Watson as "rude" and "cocky"). This divergence is most acute at what I believe to

be a key juncture: whether or not the strip-searches of the residents of Haney Cottage were authorized by staff members or instead were initiated by police. It is of course the facts as asserted by Katherine Reynolds ("Reynolds"), the non-moving party, that we must follow. Bellewood Presbyterian Home for Children ("Bellewood") is a private group home for abused and at-risk children, with an explicitly religious mission, which is under contract to the Kentucky Cabinet for Human Resources. Reynolds was sent to Bellewood after being adjudicated delinquent for marijuana possession, second-degree forgery, and fraudulent use of a credit card. Joint Appendix ("J.A.") at 84. While Reynolds and others were sent to Bellewood after juvenile delinquency proceedings, this is not true of all of Bellewood's residents. Reynolds was seventeen at the time of the incident, and lived at Haney Cottage with other juveniles and staff members. J.A. at 207, 213, 218.

On June 8, 1997, Reynolds and two other residents of Haney Cottage took a walk on the Bellewood grounds. When they returned, they were acting "strange" and two Bellewood staff members, Melissa Adamchik ("Adamchik")[1] and Stephanie Jacob ("Jacob"), suspected the girls of using drugs. J.A. at 89. At roughly the same time, Anchorage Police Officer Toby Lewis ("Lewis"), whose beat included Bellewood, called the cottage from his cell phone as he drove by. Lewis testified that he called "just to say hi." J.A. at 157. During the course of the friendly conversation, Adamchik and Jacob informed Lewis of their suspicions of drug use. J.A. at 86, 143-44, 158-62. Lewis then entered the cottage, and the decision was made to search the girls' rooms. J.A. at 158-62. Lewis's deposition testimony was that Adamchik and Jacob had asked him to search the girls, and when he informed them that he could not, and offered to search the rooms, they then

---

[1] Melissa Adamchik is the staff member's married name; in the record, she is sometimes identified by her maiden name, Melissa Wambaugh.

asked him to do that. J.A. at 161-63. Adamchik testified that they did not ask Lewis to perform a search, which conforms to her account of events in written incident reports, but that a call was placed to Carol Wochenko, head therapist for Haney Cottage, who indicated her approval of the room searches. J.A. at 80, 89, 121-22; Dep. of Melissa Adamchik, R. 162, at 37. Lewis called in for backup, and Officer James Ennis ("Ennis") arrived at the scene. A search of all five rooms at Haney Cottage ensued, during which time a third Anchorage police officer, Officer Timothy Young ("Young") arrived. J.A. at 86. In Reynolds's room, two packs of cigarettes and an empty plastic bag (the "plastic baggy . . . which the officers believe may have contained drugs" noted by the majority) were found; in other residents' rooms, seven lawfully-prescribed Depakote tablets, a clear vial with a white powder residue, and a small baggie with trace amounts of an unidentified brown substance were found. J.A. at 86. The latter two items were later sent to be tested, and the powder turned out to be non-drug related, while the brown substance was not substantial enough to be tested. J.A. at 186. The district court stated that Reynolds and other Haney Cottage residents "admitted having previously used drugs while living" at the cottage, J.A. at 29. Presumably this is meant to have relevance in determining the reasonableness of subsequent events; this statement may refer to Officer Lewis's testimony that at a prior talk he had given to the residents of Haney Cottage, Reynolds had stated "that she has used drugs in the past and she will continue to use drugs." Dep. of Toby Lewis at 93-94. Whatever the reliability of this hearsay, such adolescent bravado has limited value in determining whether Reynolds had contraband on her person at some future time.

At this point, the majority repeats the district court's description of a statement by Reynolds to the supposed effect "that she might have drugs hidden in her undergarments." In fact, frustrated by what she no doubt saw as an intrusive and ultimately fruitless search of her residence, Reynolds pointed out to Jacob that room searches were useless, because the

girls could have contraband on their persons. "[I]t just seemed kind of pointless to me." J.A. at 261 (Dep. of Katherine Reynolds). The decision was then made to perform a strip-search on the girls. According to Lewis, it was Ennis who made the instant decision to search the girls, but consistent with his earlier testimony that the entire incident was prompted by a staff request to search the girls, Lewis also testified that when Watson arrived, he informed Watson that the staff had requested that the girls be searched. J.A. at 189-90, 199-200. Watson testified that when she arrived, both staff members and her three fellow officers individually requested that she perform the search. J.A. at 274-75, Dep. of Leslie Watson at 15-19. Adamchik, on the other hand, testified that the first mention of strip-searches came from the officers, that she did not request the strip-searches, and that she never heard Jacob request the strip-searches. J.A. at 128-29, 134-35, 137-38. No further phone call was placed to Carol Wochenko. Reynolds testified that Adamchik or Jacob informed her that the police had decided to strip-search the girls, and other Haney Cottage residents described Adamchik as visibly physically distressed at the strip-searches. Dep. of Katherine Reynolds at 143-44, 180 ("[S]he said that they [the police] were the ones that initiated it, the strip search"); Dep. of Carla Dana Hudson at 184-85; Dep. of Shatonya Lanyce Elam at 136-37. At that point, each girl was taken into her own room by Watson and strip-searched with Adamchik present. Although Watson testified that each girl was first instructed to remove her shirt and bra, and then put them back on, and then remove her pants and underwear and bend over, and then put her clothing back on, at least one of the girls testified that to the contrary, she was entirely naked during the search. J.A. at 283-84 (Dep. of Leslie Watson); Dep. of Sarah Lynette Holman, R. 101, at 45. Each girl was also made to bend over and spread her buttocks. No drugs were discovered.

"Warrantless searches are *per se* unreasonable under the fourth amendment, except in a few carefully delineated instances." *United States v. Radka*, 904 F.2d 357, 360 (6th

Cir. 1990); *see also Groh v. Ramirez*, 124 S. Ct. 1284, 1290-91 (2004) (reaffirming presumption that warrantless searches are unreasonable in context of search of home). Those exceptions include automobile searches, consented-to searches, searches incident to arrest, seizures of items in plain view, *Terry* stops, the hot-pursuit rule, and searches in order to prevent the loss or destruction of evidence. The district court relied upon the "special needs" doctrine in granting qualified immunity to Watson. J.A. at 29, 34-35. The "special needs" doctrine, first articulated by Justice Blackmun in his concurring opinion in *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985), constitutes an exception to the rule that all searches must be pursuant to a search warrant obtained by the demonstration of probable cause in those cases where "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Id.* *T.L.O.* involved a search of a public-school student by school officials on the basis of particularized suspicion, but the "special needs" doctrine has since been extended by the Supreme Court to allow suspicionless drug testing of public-school students involved in after-school activities, *see Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822 (1990), and workers in sensitive industries, *see Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602 (1989) (railway employees who violate safety rules or who are involved in accidents)*; Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989) (customs officials who carry a firearm or work in drug interdiction), sobriety checkpoints, *see Mich. Dep't of State Police v. Sitz*, 496 U.S. 444 (1990), and warrantless searches of probationers' private residences, *see Griffin v. Wisconsin*, 483 U.S. 868 (1987). The Court has made clear, however, that searches whose primary purpose is law enforcement are not "special needs" searches. *See Ferguson v. City of Charleston*, 532 U.S. 67 (2001); *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000). Although *Bell v. Wolfish*, 441 U.S. 520 (1979), predates *T.L.O.*, its holding that pretrial detainees can be subject to body-cavity searches after every contact visit consonant with the Fourth Amendment has been later contextualized by the Supreme

Court as part of the "special needs" doctrine. *See Skinner*, 489 U.S. at 619-20. Each case cited by the majority in the first part of its analysis is thus part of the "special needs" exception to the warrantless search per se rule.

Under the "special needs" doctrine, a search of a particular student, with the exception of drug testing, must be supported by reasonable suspicion, which Reynolds concedes exists in this case. Reynolds's Reply Brief at 1; *T.L.O.*, 469 U.S. at 341-42. We have relied upon this holding to extend qualified immunity to officials performing strip-searches of public-school students for drugs. *See Williams v. Ellington*, 936 F.2d 881, 887-89 (6th Cir. 1991). The majority therefore is likely correct to conclude that Bellewood Home "had a strong interest in eliminating and preventing drug use on the premises by its residents" that could support a warrantless strip-search of Reynolds by Bellewood's staff upon reasonable suspicion that she was concealing contraband on her person. The majority in the next paragraph then reveals its logical misstep in stating, "The *police officers* justifiably concluded that the only way to assuage these concerns . . . was to strip-search the girls." This marriage between the needs of the Bellewood Home and the conclusions and actions of the police officers is not merely a question of the identity of the searcher, but of the object of the search. Whether a warrantless strip-search initiated and authorized by Bellewood staff, but conducted by police, would have been a valid "special needs" search was a question expressly left open by *T.L.O.*, 469 U.S. at 342 n.7 (reserving question of "searches conducted by school officials in conjunction with or at the behest of law enforcement agencies"). This question is thus perhaps deserving of more than a page of analysis in its answer, but that answer is entirely academic in this case: taking Reynolds's version of facts as correct, we must assume that police initiated and performed the strip-searches on their own. Under those facts, it becomes clear that a constitutional violation did, in fact, occur. Police officers, invited onto private property, cannot initiate a warrantless strip-search of citizens merely because some other authority has the right to

search those citizens to maintain order in its facility. That result is clearly contrary to the sharp line drawn by the Supreme Court between valid "special needs" searches and those that are unlawful because they serve ordinary law enforcement goals as well as special needs. *See Ferguson*, 532 U.S. at 79-80.

The majority in its ultimate conclusion that no constitutional violation occurred relies on *United States v. Knights*, 534 U.S. 112 (2001). To the extent that *Knights* eschewed reliance on the "special needs" exception to the general rule that a warrantless search is unconstitutional in favor of a more general balancing approach, that case is necessarily limited to its facts by subsequent cases which have reaffirmed the per se rule/carefully delineated exceptions approach to warrantless searches of the home. *See Groh*, 124 S. Ct. at 1290-91. In fact, *Knights* has not been cited again by the Supreme Court in deciding nearly a dozen cases involving Fourth Amendment reasonableness. Nonetheless, even assessing the search under *Knights*'s general reasonableness equation, I believe this search was still unreasonable, because the key problem with this search is that the government had no interest in it beyond a generalized interest in law enforcement, and that interest cannot justify the strip-search, particularly of a minor, based merely on reasonable suspicion. *See Knights*, 534 U.S. at 118-19 ("reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" (quoting *Wyoming v. Houghton,* 526 U.S. 295, 300 (1999)). While Bellewood had an interest in maintaining order in its facility, one that may have been served by the search of Reynolds, Bellewood was not the entity searching Reynolds, nor is it necessarily a governmental entity at all; it is a private religious home for children. Whether or not that private institution can "deputize" police officers to search its residents, surely police officers cannot of their own initiative do so without being subject to the normal rules governing

such searches. If Reynolds had been home on a weekend visit, as was regular, and her parents had invited Watson into the home to speak to Reynolds about the dangers of drug use, would the majority hold that Watson could then proceed to strip-search Reynolds without her parents' permission because their interests in keeping their daughter away from drugs justified the intrusion on Reynolds's right to be free from unreasonable searches? I see little logical distinction between such obviously excessive police behavior and the actions of police we must assume took place here.

Finally, I disagree that Watson is entitled to qualified immunity. Because the general rule that a warrantless search is unreasonable was clearly established in 1997, I believe that the majority inverts the proper inquiry when it notes that no court has addressed the application of the Fourth Amendment to the situation before us today in support of qualified immunity; instead, if no case suggests that a police officer is entitled to rely on similar administrative "special needs" in initiating a strip-search herself, Watson is not immune from suit. No cases in our circuit, nor indeed any court addressing the related issue of when searches on school grounds are appropriate, suggest that Watson's actions were justified.[2]

Since *T.L.O.*, courts have generally held that *T.L.O.*'s reasonable-suspicion standard applies to searches conducted by law enforcement officials at the behest of school officials. *See Shade v. City of Farmington*, 309 F.3d 1054, 1060 (8th Cir. 2002) (search constitutional where "school officials, not law enforcement officers, initiated the investigation and the search"); *Cason v. Cook*, 810 F.2d 188, 192 (8th Cir. 1987) (no violation where "no indication that but for the deputy's involvement, the plaintiff would not have been searched");

---

[2]*United States v. Knights,* 534 U.S. 112, 121 (2001), can of course offer Watson no help at this stage of the inquiry, as it was decided after the events in question took place; additionally, there is no indication anywhere in the record that Watson knew that Reynolds was herself a delinquent or that Haney Cottage was home only to delinquents.

*State v. N.G.B.*, 806 So. 2d 567, 568-69 (Fl. Dist. Ct. App. 2002) ("reasonable suspicion was the appropriate standard" where search of student by police officer was initiated and directed by school official); *In re Josue T.*, 989 P.2d 431, 437 (N.M. Ct. App. 1999) (reasonable suspicion applies where police officer "merely assisted the school official, during the school day, at the school official's request, to protect student welfare and the educational milieu"); *In re Angelia D.B.*, 564 N.W. 2d 682, 688, 690 (Wisc. 1997) (reasonable suspicion standard applies where school liasion officer "became involved in th[e] investigation only after school officials requested his assistance" and worked in conjunction with school officials). *But see In re A.J.M.*, 617 So. 2d 1137, 1138 (Fl. Dist. Ct. App. 1993) (where police officer "directed, participated in or acquiesced in the search," probable cause is required). Other courts have also held that where a police officer is employed by the school or school district and the search is consonant with the "special needs" of school discipline, the *T.L.O.* standard also applies. *See People v. Dilworth*, 661 N.E.2d 310, 317 (Ill. 1996). But when confronted with a search like that at issue here, initiated by law enforcement officers not under the supervisory control of school authorities, courts have uniformly held that probable cause is required. *See In re F.P.*, 528 So. 2d 1253, 1254 (Fl. Dist. Ct. App. 1988) (exception to probable cause requirement "does not apply when the search is carried out at the behest of the police"); *State v. Tywayne H.*, 933 P.2d 251, 254 (N.M. Ct. App. 1997) (*T.L.O.* standard inapplicable where search "conducted completely at the discretion of the police officers"); *In re Thomas B.D.*, 486 S.E.2d 498, 500, 504-506 (S.C. Ct. App. 1997) (while search was of student and took place on school property, *T.L.O.* standard inapplicable because police were acting on their own authority and not as agents of the school). *See generally* Wayne R. LaFave, *Search and Seizure* § 10.11 (discussing three categories of cases). These cases demonstrate once again that the "special needs" doctrine is wholly inapplicable on Reynolds's version of the facts, where police, unconnected to the institution whose "special needs" are said to justify the search,

conducted searches on their own initiative. *See also Tarter v. Raybuck*, 742 F.2d 977, 983 (6th Cir. 1984) (pre-*T.L.O.* case noting that "[t]he presence of the police officers does take this case purely out of the context of school officials seeking to maintain an environment conducive to the educational process" but concluding that "involvement of the police with respect to the plaintiff is marginal" in case where plaintiff was searched only by school officials acting on their own). The consensus of all prior courts is that when police act on their own initiative, they cannot rely on the "special needs" of school officials. *See F.P.*, 528 So. 2d at 1254; *Tywayne H.*, 933 P.2d at 254; *Thomas B.D.*, 486 S.E.2d at 500, 504-506.

I would therefore reverse the district court's decision and remand the case for trial.