**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0002n.06

**No. 08-5947**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Jan 03, 2011**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| **DENNYSON WARFIELD**, | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellant*. | ) | |
| | ) | |

BEFORE:    NORRIS, COLE, and KETHLEDGE, Circuit Judges.

**COLE, Circuit Judge**.  Defendant-Appellant Dennyson Warfield appeals the denial of his motion to suppress drugs seized at a jail after he dropped them in anticipation of a strip-search for suspected possession of contraband.  For the reasons below, we **AFFIRM**.

**I.**

On February 14 and 28, 2006, Kentucky State Police Detective Brad Harper worked with a confidential informant who successfully arranged two purchases of cocaine and cocaine base from Warfield.  After each transaction, Detective Harper recovered approximately three ounces of cocaine or cocaine base from the informant's purchase from Warfield.

The Kentucky state police then had the informant arrange to meet Warfield on March 16, 2006 to purchase an additional eight ounces of crack cocaine, and they learned from the informant

that Warfield would be driving the black pick-up truck he had used during the February 28, 2006 transaction. Having performed a background check on Warfield prior to March 16, Detective Harper knew that Warfield was driving on a suspended license. According to Detective Harper, who was following Warfield's truck on March 16 in an unmarked police car, Warfield was swerving into and out of the emergency lane on the highway. Moreover, when two state troopers traveling in marked police cars approached Warfield from the opposite direction, Warfield failed to dim his lights.

The two state troopers (one of whom had a drug-detection dog) stopped Warfield before he could meet the informant, having heard over the police radio that Warfield had been swerving; they performed their own license check of Warfield, and then arrested him for operating a motor vehicle with a suspended driver's license. After placing Warfield in one of the police cars, the officers walked the dog around Warfield's truck; the dog alerted to the driver's door and subsequently to the driver's seat, indicating the odor of drugs. The dog also alerted to Warfield's truck's tailgate, where Warfield had sat briefly while being arrested. A pat-down search of Warfield and search of Warfield's vehicle revealed no contraband or weapons.

The police then transported Warfield to the Warren County Regional Jail. Detective Harper relayed the information to the officers at the jail regarding the drug-detection dog's indication of the presence of drugs where Warfield had sat inside and outside his vehicle and the officers' failure to find any drugs in Warfield's vehicle or in a pat-down search of him. Based on this information, a nine-year-old drug conviction, and Warfield's refusal to submit to a search without his lawyer present, the police at the jail suspected Warfield of possessing drugs on his person and took him into a room for an unclothed pat-down search. After the police took him into a separate room but before

they could conduct the strip-search, Warfield dropped a small baggie that he had concealed in his

crotch area. The baggie contained approximately eight ounces of white powder, which tested

positive for crack cocaine.

Warfield was subsequently prosecuted for distribution of fifty grams or more of cocaine base,

in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(iii), and distribution of cocaine, in violation of

21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Warfield moved to suppress the cocaine as the fruit of an

illegal search, but the district court denied his motion after a suppression hearing. Warfield then

entered a conditional guilty plea maintaining his ability to appeal the district court's denial of his

motion to suppress. The district court sentenced Warfield to 151 months of imprisonment, to be

followed by five years of supervised release. Warfield timely appealed the denial of his motion to

suppress.

## II.

In assessing the denial of a motion to suppress, we review the district court's findings of fact

for clear error and its conclusions of law de novo. *United States v. Foster*, 376 F.3d 577, 583 (6th

Cir. 2004). We view the evidence "in the light most likely to support the district court's decision."

*United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999) (internal quotation marks and

citation omitted).

Warfield objects centrally to the threatened strip-search at the jail, the anticipation of which

led him to drop the baggie containing the crack cocaine. Because it was merely the *anticipation* of

a strip-search that led to Warfield's action, the government argues that Warfield abandoned the drugs

before the alleged search, and that Warfield's challenge to the search is therefore besides the point.

This may be so, *see United States v. Robinson*, 390 F.3d 853, 873-74 (6th Cir. 2004) ("If property has been 'abandoned' . . . , the Fourth Amendment is not violated through the search or seizure of this property." (citation omitted)), but we proceed assuming *arguendo* that the seizure's legitimacy is tied to that of the strip-search, because the threat of the search spurred Warfield's abandonment of the baggie. Before reaching that issue, however, we must address the propriety of Warfield's detention in the first place.

Warfield does not, nor could he, contest that the Kentucky state police could properly arrest him for driving on a suspended license. *See* KY. REV. STAT. §§ 186.620(2), 186.990(3), 532.090(2). The police therefore did not need reasonable suspicion or probable cause of Warfield's commission of any other crime to take him into custody and search him incident to arrest. *See United States v. Robinson*, 414 U.S. 218, 233-35 (1973); *United States v. Smith*, 549 F.3d 355, 360-61 (6th Cir. 2008). Moreover, "[a] police officer's determination as to how and where to search the person of a suspect whom he has arrested . . . , while based on the need to disarm and to discover evidence, does not depend on . . . [the possibility] that weapons or evidence would in fact be found upon the person of the suspect." *Robinson*, 414 U.S. at 235. We have explained further that, after a lawful arrest, "the suspect and any effects in his possession . . . subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest . . . and the taking of the property." *Smith*, 549 F.3d at 361 (internal quotation marks and citation omitted).

The search at issue here, nevertheless, was not an ordinary pat-down incident to arrest, but a full, unclothed search at the jail. Such a search comports with the Fourth Amendment only if the

circumstances demonstrate that it was "reasonable." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). In making such a determination, we must balance "the need for the particular search against the invasion of personal rights that the search entails," and must "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.*

Applying this balancing test, we initially note that the relatively limited scope, standard manner and separate room in which the jail officers were about to strip-search Warfield weigh in favor of finding the search reasonable. The inquiry here, however, centers principally around the context of and justification for the strip-search. As to the context, the personal rights affected by a strip-search greatly depend on the location—for example, a school versus a prison—and are least weighty in a jail or other detention facility, such as here. *See Reynolds v. City of Anchorage*, 379 F.3d 358, 362-64 (6th Cir. 2004). This difference exists because "[a] detention facility is a unique place fraught with serious security dangers . . . [including the s]muggling of . . . drugs." *Bell*, 441 U.S. at 559.

As to the justification for the search, courts sometimes examine the local policies in the course of the reasonableness determination, *see, e.g.*, *Dobrowolskyj v. Jefferson Cnty.*, 823 F.2d 955, 956, 958 (6th Cir. 1987), and we here find instructive Kentucky's jail policies on when strip-searches are appropriate: "A prisoner may be strip searched only on reasonable suspicion that is based upon the existence of objective information that may predict the likelihood of the presence of" drugs. 501 KY. ADMIN. REGS. 3:120, § 3(1)(b); *see also Reynolds*, 379 F.3d at 364 (finding a strip-search reasonable because of particularized suspicion of drug possession, among other things). The

Kentucky regulations premise "reasonable suspicion" on a showing of, in relevant part, "[a] criminal history of offenses involving . . . the possession of contraband," or "[i]nstitutional behavior, reliable information, or history that indicates possession . . . of contraband, [or] the refusal to submit to a clothed pat down search." 501 KY. ADMIN. REGS. 3:120, § 3(1)(b)(2)-(3).

Here, three facts justified the jail officers' reasonable suspicion that Warfield possessed drugs: (1) his prior drug conviction; (2) his refusal to submit to a search; and, most importantly, (3) the relayed information regarding Warfield's suspected possession of contraband, specifically through the alerting of the drug-detection dog.[1] These considerations created reasonable suspicion that Warfield possessed drugs, and thus provided an adequate reason under *Bell* for the jail officers' strip-search of Warfield. Therefore, even assuming Warfield did not abandon the baggie of crack cocaine, the threatened strip-search of Warfield was reasonable under the totality of the circumstances and did not violate Warfield's right to be free of unreasonable searches and seizures under the Fourth Amendment.

---

[1]Warfield makes much ado of the length of his roadside detention, and the absence of testimony regarding the first dog's training or the alerting of a second drug-detection dog that the police used later. However, these arguments are not well taken. First, the cases Warfield cites discussing the propriety of extending a traffic or *Terry* stop through use of a drug-detection dog are inapposite, because Warfield's arrest justified his detention for up to ninety days, *see* KY. REV. STAT. §§ 186.620(2), 186.990(3), 532.090(2), let alone the minutes or hours at issue here. Second, testimony about the dog's training would be necessary only to establish *probable cause* justifying Warfield's arrest, *see, e.g.*, *United States v. Torres-Ramos*, 536 F.3d 542, 554 (6th Cir. 2008), not—as sought here—to support a reasonable suspicion that Warfield possessed contraband at the jail where none was found in his car or clothing after the dog's alerting. Third, the officer's testimony as to the use of another dog, without an affirmative statement that the second dog alerted as well, is inadequate to undermine the officer's extensive testimony about the first dog's actions.

**III.**

For the foregoing reasons, we **AFFIRM** the district court's denial of Warfield's motion to suppress.