Jefory MASHBURN, On Behalf of Minor CM, Joseph Cornelison, On Behalf of Minor RC, Nathanael Williams, Amy Hinmon, Joseph Lewis, individually and on behalf of a class of all others similarly situated, Plaintiffs,

v.

YAMHILL COUNTY, Tim Loewen, both individually and in his official capacity as Director, Chuck Vesper, both individually and in his official capacity as Division Manager, Defendants.

No. CV 08–718–HU.

United States District Court,
D. Oregon,
Portland Division.

March 11, 2010.

As Amended May 4, 2010.

Leonard Randolph Berman, Law Office of Leonard R. Berman, Portland, OR, for Plaintiffs.

Steven A. Kraemer, Leslie Anne Edenhofer, Hoffman Hart & Wagner, LLP, Portland, OR, for Defendants.

## OPINION & ORDER

MOSMAN, District Judge.

Plaintiffs are or were minors who were strip searched upon entry into the Yamhill County Juvenile Detention Center ("YCJDC") and after "contact visits" with non-YCJDC staff members, including their own lawyers. Plaintiffs sued Yamhill County, Tim Loewen, the Yamhill County Director, and Chuck Vesper, the Yamhill County Division Manager under 42 U.S.C. § 1983, alleging that the YCJDC strip search policy is unreasonable under the Fourth Amendment. The parties filed cross-motions for summary judgment that centered on the constitutionality of the YCJDC strip search policy.

Magistrate Judge Hubel heard oral argument on both motions and issued Findings and Recommendation ("F & R") (# 60) on December 4, 2009. He concluded the "blanket" strip searches upon entry to the detention facility were constitutional, but the post-contact-visit strip searches during detention were not. Despite finding that post-contact-visit strip searches violated plaintiffs' Fourth Amendment rights, Judge Hubel recommended that Mr. Loewen and Mr. Vesper be granted qualified immunity because plaintiffs' rights had not been clearly established. The parties filed objections to the F & R, as well as responses to the other parties' objections.

Upon review, I agree with Judge Hubel's recommendation as to qualified immunity, plaintiffs' standing to seek an injunction, and the unconstitutionality of the post-contact-visit strip searches. I further find that the scope of the admission search policy is excessive in relation to the government's interest and therefore unconstitutional.

## I. *Factual Background*

As Judge Hubel observed, "the strip searches authorized by the [ YCJDC] policies are highly intrusive, as the juveniles are completely unclothed for inspection by a stranger, are required to manipulate either their breasts or scrotum for inspection, and to squat and cough." (F & R(# 60) 1253.) Moreover, the entire search, including inspection of the minor's hair, mouth, hands, arm pits, and feet, is conducted while the minor is completely unclothed. (*Id.* at 1247–49; Kraemer Aff. (# 29) Ex. 1; Berman Decl. (# 27) Ex. 1.)

YCJDC policy authorizes staff members to conduct strip searches after a juvenile is admitted to the detention center. The detention center has a detailed intake policy

that evaluates a juvenile's charged crime, criminal history, physical and mental well-being, and the behavior giving rise to the juvenile's arrest. (Kraemer Aff. (#29) Ex. 2–3.) A juvenile may only be admitted if the juvenile: (a) is the subject of a court order to detain; (b) is the subject of a Circuit Court statewide or nationwide warrant; (c) violated conditions of probation; (d) violated conditions of conditional release; (e) allegedly committed a felony; (f) allegedly possessed a firearm unlawfully; (g) allegedly committed the offense of Criminal Manufacture or Delivery of a Controlled Substance; (h) committed a misdemeanor resulting in physical injury; (i) is a fugitive from another jurisdiction; or (j) wilfully failed to appear at a juvenile court proceeding. (F & R(#60) 1247; Kraemer Aff. (#29) Ex. 2.) In addition to one of these factors, the juvenile must also be either a flight risk or engaged in behavior that endangers herself, others, or the community. (*Id.*)

The detention center policy also authorizes strip searches after "contact visits" with non-YCJDC staff. Contact visits take place in an open room and are only permitted when the visitor is professional, such as an attorney or mental health counselor. Personal visitors, such as parents or guardians, are allowed only non-contact visits in which the visitor and the juvenile are physically separated by a glass partition. The YCJDC policy does not authorize strip searches after non-contact visits.

## II. *Standard of Review*

The magistrate judge makes only recommendations to the court, to which any party may file written objections. The court is not bound by the recommendations of the magistrate judge, but retains responsibility for making the final determination. The court is generally required to make a *de novo* determination of those portions of the report or specified findings or recommendation as to which an objec-

tion is made. 28 U.S.C. § 636(b)(1)(C). However, the court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the F & R to which no objections are addressed. *See Thomas v. Arn,* 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Reyna–Tapia,* 328 F.3d 1114, 1121 (9th Cir.2003). While the level of scrutiny under which I am required to review the F & R depends on whether or not objections have been filed, in either case, I am free to accept, reject, or modify any of the magistrate judge's F & R. 28 U.S.C. § 636(b)(1)(C).

## III. *Evaluating the Reasonableness Under the Fourth Amendment*

Plaintiffs allege that the YCJDC strip search policy violates their Fourth Amendment right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. "Here, the policies at issue involve a full strip search of juveniles upon their admission to YCJDC and after contact visits with non-Juvenile Department staff, without any requirement for reasonable suspicion to suspect the juvenile possesses contraband." (F & R(#60) 1253.) This factual scenario raises two key questions that bear on the constitutionality of the policy. The first question is whether the search is justified at its inception; that is, whether it is reasonable under the Fourth Amendment for the government to perform a strip search without individualized suspicion. The second question is whether the scope of the search is reasonable; that is, whether the government's "need for the particular search" outweighs "the invasion of personal rights that the search entails." *See Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

## A. Whether the Search is Justified at its Inception

The Fourth Amendment generally requires searches to be conducted pursuant to probable cause, or at least "some quantum of individualized suspicion." *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619, 624, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). But, "in certain limited circumstances, the Government's need to discover such latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion." *Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 668, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). These cases, commonly referred to as "special needs" cases, ask whether a government need, "beyond the normal need for law enforcement, make[s] the warrant and probable-cause requirement impracticable." *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls,* 536 U.S. 822, 829, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (internal quotations omitted).

For example, special needs cases frequently arise in the context of public schools, where the Fourth Amendment "reasonableness" standard is influenced by "the schools' custodial and tutelary responsibility for children." *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 656, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). These cases reflect the understanding that "[a] student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety." *Earls,* 536 U.S. at 830, 122 S.Ct. 2559.

Fourth Amendment challenges in the context of prisons and jails are not typically referred to as special needs cases, but the Supreme Court and Ninth Circuit have upheld prison searches predicated on less than probable cause, or even reasonable suspicion. In particular, the Supreme Court and Ninth Circuit have upheld suspicionless strip searches of arrestees who were confined in a prison's general population. *See Wolfish,* 441 U.S. at 558–560, 99 S.Ct. 1861; *Bull v. City and County of San Francisco,* 595 F.3d 964, 980–82 (9th Cir.2010) (en banc). In those cases, the search policies were deemed reasonable in light of the government interest in maintaining the institutional security of a prison. *Wolfish,* 441 U.S. at 560, 99 S.Ct. 1861; *Bull,* 595 F.3d at 970–72, 974–76.

## B. Whether the Scope of the Search is Reasonable

A government's special need does not, in and of itself, validate a search. *Earls,* 536 U.S. at 830, 122 S.Ct. 2559. Rather, after finding a special need, a court will consider whether the government's "need for the particular search" outweighs "the invasion of personal rights that the search entails." *See Wolfish,* 441 U.S. at 559, 99 S.Ct. 1861. In other words, even though a special need may allow YCJDC to conduct searches without individualized reasonable suspicion, the search may still be unconstitutional if it is excessively intrusive in relation to the government's need for the search.

In schools, for example, even though a student has a reduced privacy interest and the government has a special need to conduct searches based on less than probable cause, the scope of the search must not be "excessively intrusive in light of the age and sex of the student and the nature of the infraction." *New Jersey v. T.L.O.,* 469 U.S. 325, 342, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). Applying the *T.L.O.* standard, the Supreme Court recently held that a strip search of a student alleged to have given over-the-counter pain medication to other students

was unconstitutional, even though the school official had reasonable suspicion to search the student. *Safford Unified Sch. Dist. # 1 v. Redding,* — U.S. —, 129 S.Ct. 2633, 2642–43, 174 L.Ed.2d 354 (2009). In light of the intrusive and potentially damaging nature of a strip search, it was unreasonable for the school officials to conduct a strip search without information that the medication posed a danger to other students and that the student was carrying the pills in her underwear. *Id.*

## IV. The Constitutional Standard Governing Strip Searches in Juvenile Detention Facilities

Neither the Supreme Court nor the Ninth Circuit has directly ruled on the constitutionality of strip searches conducted on juvenile detainees. On the constitutional spectrum, the standard for analyzing strip searches of children at the YCJDC falls somewhere between the standards that govern searches of adult prison inmates and searches of school children.[1]

▮▮▮ Unlike students, "youth confined in a juvenile detention facility are 'under substantially greater restraint and ha[ve] a lesser expectation of privacy than do students.'" (F & R(# 60) 1251–52 (quoting *Reynolds v. City of Anchorage,* 379 F.3d 358, 364 (6th Cir.2004)).) Conversely, standards that apply in the context of an adult prison strip search are not directly transferrable to juvenile detention searches because "[s]trip searches of children pose the reasonableness inquiry in a context where both the interests supporting and opposing such searches appear to be greater than with searches of adults." *N.G. v. Connecticut,* 382 F.3d 225, 232 (2d

Cir.2004); *see also May v. Anderson,* 345 U.S. 528, 536, 73 S.Ct. 840, 97 L.Ed. 1221 (1953) (Frankfurter, J., concurring) ("Children have a very special place in life which law should reflect. Legal theories ... lead to fallacious reasoning [if] uncritically transferred to determination of a State's duty towards children"). Specifically, the State's exercise of legitimate custodial authority over the child gives the State a heightened interest in caring for detained children, which must be balanced against the child's more acute vulnerability to the intrusiveness of a strip search. *N.G.,* 382 F.3d at 232. Moreover, the power differential always present between a guard and a prisoner is greatly magnified when the "guard" is an adult and the "prisoner" is a child. A juvenile detention facility also has different penological interests, in light of the fact that some juveniles are admitted to a detention facility without having committed conduct that would constitute a crime. (*See* Kraemer Aff. (# 29) Ex. 2); *see also N.G.,* 382 F.3d at 235. Accordingly, the unique concerns of children and of the government, which have analogies in both prisons and schools, frame my analysis of YCJDC's search policy.

## V. Are the YCJDC Strip Searches Justified at Their Inception?

Plaintiffs challenge the constitutionality of conducting strip searches without reasonable suspicion any time a juvenile is admitted to YCJDC or engages in a contact visit. I conclude that defendants have shown two important interests that justify conducting some form of suspicionless search. First, like a teacher in a public school, defendants act as guardians to the

---

1. The parties requested leave to file supplemental briefing on *Bull,* 595 F.3d 964, which was decided while the motions in this case were under advisement. I denied leave both because I am familiar with the *Bull* decision and its potential applicability to this case and

because I did not think that further briefing would be helpful or necessary. *Bull* is binding precedent with respect to strip searches conducted in prisons, but *Bull's* reasoning is distinguishable in the context of juvenile detention facilities.

children in the detention facility. This guardianship status gives rise to special responsibilities and obligations to care for and protect detained children. Second, as in a prison, defendants have an interest in maintaining the security of the detention facility.

With respect to strip searches at admission, the YCJDC policy could be unconstitutional as applied to juvenile admittees whose conduct or reason for admission does not raise security concerns. But all of the plaintiffs in this case engaged in conduct that created concern about whether they would introduce drugs or weapons into the detention facility, thereby justifying the strip search at its inception. With respect to strip searches after contact visits, however, the policy is unconstitutional because YCJDC has not shown that its institutional interests justify suspicionless searches.

### A. *Admission Searches*
### 1. The Constitutionality of the Policy

Judge Hubel reasoned that the YCJDC intake process and admission criteria reflected Yamhill County's efforts to ensure that a search was not unreasonable in light of a child's individual characteristics. (F & R(# 60) 1254 (noting that the YCJDC "gathers information regarding the juvenile's medical and criminal history, whether the juvenile has a history of abuse or suicide, and the circumstances surrounding the immediate arrest, including the juvenile's demeanor.").) Defendants further note that the YCJDC "admission criteria provide that only juveniles who have committed crimes for which they could be strip searched if they were adults, are even lodged at the facility, with few exceptions, if any." (Defs.' Resp. (# 73) 3.) But the YCJDC intake process and admission criteria, however thorough or stringent, means little to the constitutional analysis in this case absent a relationship between the factors that influence admission and the factors that create a government need to strip search juvenile detainees.

Even assuming that the YCJDC intake process evaluates each juvenile's charged conduct, mental and physical health, and circumstances of arrest, defendants have not shown that the criteria for admission to YCJDC bear a reasonable relationship to the facility's institutional security concerns. For example, if a juvenile commits an armed robbery, YCJDC may admit the juvenile because he is charged with a violent felony and may be a danger to others. In that case, the factor that drives the government to detain the juvenile—community safety—is the same factor that creates an institutional interest in strip searching him. But the YCJDC policy also allows juveniles to be admitted to the detention facility for failing to appear for a court hearing, disobeying a court order, or being a fugitive from another jurisdiction. (F & R (# 60) 1247.) In these cases, the factors that support detention are not the same as the factors that support a strip search. The fact that juvenile runaways and truants may be admitted to juvenile detention facilities is one of the reasons that the constitutional standards governing adult prison searches are not directly applicable in the context of juvenile detention facilities. *See N.G.*, 382 F.3d at 235 ("No doubt a state has a legitimate interest in confining such juveniles in some circumstances, but it does not follow that by placing them in an institution where the state might be entitled, under *Turner*, to conduct strip searches of those convicted of adult-type crimes, a state may invoke *Turner* to justify strip searches of runaways and truants."). On the face of the YCJDC policy, some juveniles are admitted and strip searched for reasons that would not result in adult incarceration, or that do not raise serious community safety

concerns. In those cases, a strip search would not be constitutional without reasonable suspicion.

## 2. The Constitutionality of Searches of Individual Plaintiffs

A strip search is designed to meet the institution's security concern that drugs and weapons will be introduced into the detention facility. Ideally an institution would search only those juveniles whose underlying conduct involved drugs or a weapon. But I cannot assume on this record that YCJDC has the resources or opportunity to make accurate factual findings regarding the actual conduct of an admitted juvenile, as opposed to categorical distinctions based on the juvenile's charges. Absent evidence that YCJDC could rely on readily ascertainable facts about each juvenile's background upon admission, it is appropriate for the facility to make determinations about the likelihood of smuggling drugs or weapons based solely on categories of charged conduct.

Judge Hubel observed that, with the exception of Ms. Hinmon, "each of the named plaintiffs was charged with a crime that included an element of force or had a criminal history that included such a charge." (F & R(# 60) 1254 n. 5.) Plaintiff Nathanael Williams was arrested on charges of Robbery in the Third Degree,[2] plaintiffs CM and RC were arrested on charges of Sexual Abuse in the First Degree,[3] and plaintiff Joseph Lewis had a prior arrest for carrying a concealed weapon.[4] (*Id.* at 1249–50.) Ms. Hinmon was admitted for failure to complete a drug and alcohol evaluation, a charge which raised concern about whether she would introduce drugs or alcohol into the facility. (*See id.* at 1249.)

Given the nature of these charges, the government interest leans more toward the adult prison side of the continuum. In *Bull*, the Ninth Circuit made clear that the balance between the institutional need for some form of strip search and the intrusiveness of a visual body-cavity search "must be resolved in favor of the jail system's institutional concerns," at least where an arrestee is classified for housing in the general population of the jail or prison. 595 F.3d at 975–76, 981–82. Even taking into account the heightened concerns of the children being subjected to a strip search, I conclude that it was reasonable for Yamhill County to conduct a strip search of the named plaintiffs in light of the institutional security concerns raised by the charged conduct and juvenile criminal history known to YCJDC staff at the time of the search.

### B. *Contact Visits*

I agree with Judge Hubel that it is unconstitutional to strip search juveniles after contact visits and without individualized suspicion that the juvenile has acquired contraband. Because contact visits occur primarily between the juvenile and his or her attorney, the repetitive strip searches at YCJDC burden not only the juvenile's privacy interests, but also the juvenile's right to counsel. One of the plaintiffs in this case, Ms. Hinmon, was admitted to YCJDC on charges of Failure to Appear on a Minor in Possession charge and Contempt of Court for Failing to Complete a Drug/Alcohol Evaluation. (F & R(# 60) 1249.) She was strip searched

---

2. Under ORS 164.395, Robbery in the Third Degree requires a person to "use [ ] or threaten [ ] the immediate use of physical force upon another person."

3. Under ORS 163.427, Sexual Abuse in the First Degree may be committed if a person subjects another person to sexual contact through forcible compulsion.

4. *See* Kraemer Aff. (# 29) ¶ 7 & Ex. 5.

four times in six days—once upon admission to YCJDC and three more times after meeting with her attorneys. (*Id.* at 1249.) CM and RC, plaintiffs who were arrested on charges of Sexual Abuse in the First Degree, were searched five times and eight times, respectively, over the course of five days. (*Id.*) It is not hard to imagine a juvenile like Ms. Harmon begging her attorney not to come visit her again, lest she be subjected to an N$^{th}$ strip search. Nor is it any better to envision a troubled young person declining to visit with her therapist for the same reason.

In contrast to the heightened interests of children subjected to repetitive post-contact visit searches, Yamhill County's interests are reduced. Juveniles are only permitted contact visits with visitors who are extremely unlikely to provide a juvenile with drugs or weapons, and, in most cases, a strip search will already have occurred when the juvenile was admitted to the detention facility. Because the child's privacy and other constitutional interests are heightened, and the government's interests are reduced, YCJDC's general security and custodial interest are not sufficient to outweigh the intrusiveness of the strip search.

## VI. *Is the Scope of the Admission Search Reasonable?*

■ In order for the search to be reasonable under the Fourth Amendment, the government's demonstrated need must outweigh the harm caused by the search. I have found that maintaining institutional security and protecting detained children are legitimate government interests justifying—at their inception—these particular strip searches. But a search that is justified as an initial matter can nevertheless be executed in such a manner as to lose its initial constitutional protection. *See Redding,* 129 S.Ct. at 2642–43 (holding that "the content of the [searcher's] suspicion failed to match the degree of intrusion");

*see also Wolfish,* 441 U.S. at 559, 99 S.Ct. 1861 ("Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."); *Illinois v. Caballes,* 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) ("[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."); *United States v. Ramirez,* 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998) ("Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression."). And, on this record, I hold that defendants have not shown a reasonable relationship between their legitimate interests and the scope of the strip searches conducted at YCJDC.

### A. *Intrusiveness*

■ The strip searches conducted on children detained at YCJDC are unquestionably intrusive. Children and adults have a right to bodily privacy in part because "[t]he desire to shield one's unclothed figure from [the] view of strangers . . . is impelled by elementary self-respect and personal dignity." *York v. Story,* 324 F.2d 450, 455 (9th Cir.1963). For this reason, a strip search is the kind of search that "instinctively gives [courts] the most pause." *Wolfish,* 441 U.S. at 558, 99 S.Ct. 1861. Various circuit courts have described strip searches as "a serious intrusion upon personal rights," *Justice v. City of Peachtree City,* 961 F.2d 188, 192 (11th Cir.1992); "an offense to the dignity of the individual," *Burns v. Loranger,* 907 F.2d 233, 235 n. 6 (1st Cir.1990), and "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, [and] repulsive," *Mary Beth G. v. City of*

*Chicago,* 723 F.2d 1263, 1272 (7th Cir.1983) (quotation and citation omitted). Strip searches of children raise unique concerns, since youth "is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Eddings v. Oklahoma,* 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *see also Redding,* 129 S.Ct. at 2641 (evaluating the reasonableness of a strip search in light of "adolescent vulnerability [that] intensifies the patent intrusiveness of the exposure"); *N.G.,* 382 F.3d at 239 (Sotomayor, J., dissenting) (noting that "[c]hildren are especially susceptible to possible traumas from strip searches," particularly when they are victims of sexual abuse) (quoting *Eddings,* 455 U.S. at 115, 102 S.Ct. 869).

And the strip searches conducted at YCJDC are more intrusive than most. For example, they are not brief. *After* the minor removes all of his or her clothing, a YCJDC staff member:

1. Inspects the child from top to bottom;
2. Inspects the minor's hair;
3. Inspects the minor's ears;
4. Inspects the minor's mouth, including requiring the child to lift her upper and lower lips and run her fingers between her teeth and gums;
5. Requires the minor to blow each nostril, one at a time;
6. Inspects the minor's hands;
7. Inspects the minor's armpits;
8. Inspects a girl's breasts or a boy's testicles;
9. Requires the minor to squat and cough;
10. Requires the minor to face the wall so staff can inspect the back of the minor's body; and
11. Inspects the minor's feet, including in between the toes. (Kraemer Aff. (# 29)

Ex. 1 at 2–4.) The minor is allowed to put on his or her clothes only after all of these steps have been completed. (*Id.*) The duration of this multi-step search, and the corresponding length of time in which a juvenile stands fully exposed and subject to inspection, makes this search particularly demeaning.

The YCJDC strip searches are also, to put it charitably, astonishingly thorough. A boy is required "to lift his scrotum so that staff can inspect the area directly below the testicles." (Kraemer Aff. (# 29) Ex. 1 at 2.) If a boy is uncircumcised, "he is instructed by staff to pull back the foreskin so that the area beneath the foreskin can be inspected." (*Id.*) Girls are required to lift their breasts "so that staff can inspect the area directly below." (*Id.* at 4.)

YCJDC could mitigate the length and intensity of its strip searches by taking steps to ensure that the child is not fully exposed for longer than is reasonably necessary to accomplish its search objectives. But aside from moving the child to private area, YCJDC makes no extra effort to preserve the privacy and dignity of the searched child. For example, a child spends the entire search completely naked even though a majority of the time-consuming steps described above—including searches of hair, ears, mouth, nose, hands, armpits, and toes—do not require complete nudity. The intrusiveness of these strip searches stands in contrast to other searches of juveniles that have been held constitutional and that did indicate extra effort to preserve the privacy and dignity of the searched child. For example, in *Smook v. Minnehaha County,* the Eighth Circuit found it material that the detention center staff required a juvenile to undress only to her undergarments, which "placed her at the same level of undress as if she were at the beach in a swimsuit." 457

F.3d 806, 811–12 (8th Cir.2006) (internal quotation and citation omitted). Likewise, in *Reynolds v. City of Anchorage*, each detained girl was instructed "to remove her blouse and bra, put them back on, and then to remove her bottom clothing and underwear and bend over to allow a visual inspection of her rectal area." 379 F.3d at 361. Even the juveniles subjected to the highly invasive strip searches at issue in *N.G. v. Connecticut* may have been provided robes during the search at issue. *See* 382 F.3d at 228 (noting that the strip search policy was amended in 2002, after plaintiffs were searched, to deauthorize visual inspections of a juvenile's vaginal and anal body cavities, but not indicating whether use of robes predated the 2002 policy amendment).

### B. *The Relationship Between the Government Interest and Scope of the Strip Search*

Defendants raise valid concerns about their obligations to care for and protect juveniles who are admitted to YCJDC. But the existence of that need, in and of itself, says little about the reasonableness of the search under the Fourth Amendment because a search may be too intrusive in light of the underlying interests justifying it. Accordingly, it is appropriate to ask whether there is a "valid, rational connection between the ... regulation and the legitimate governmental interest put forward to justify it." *See Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (internal quotation omitted) (evaluating the constitutionality of regulations in adult prisons). Even ac- cepting that defendants' concerns are legitimate, the record does not show that a highly invasive strip search bears a reasonable relationship to the interests defendants identified.

Charles Vesper, Division Manager for the Yamhill County Juvenile Corrections Division, stated that the admission strip searches at YCJDC "have recovered drugs, contraband and other illegal items during unclothed searches of juveniles who are admitted into YCJDC." (Vesper Aff. (# 21) ¶ 9.)[5] In Mr. Vesper's opinion, "[m]ost, if not all of these items would not have been discovered during a normal, clothed pat down search." (*Id.*) Mr. Vesper also asserts that "the period of time when the person is completely unclothed is no longer than is reasonably necessary to complete the search." (*Id.* at ¶ 6.)

There is a lot of space on the continuum between a fully-clothed pat-down search and the thorough strip search conducted pursuant to YCJDC policy, however, and Mr. Vesper fails to explain why it is "reasonably necessary" to perform a search of a juvenile's hair while the juvenile is completely undressed. Even assuming that a fully-clothed pat-down search would not reveal contraband, nothing in Mr. Vesper's affidavit demonstrates these harms could not be discovered in a search that is more extensive than a fully-clothed pat-down search but less intrusive than a lengthy and intrusive strip search. There are several less intrusive alternatives to the YCJDC policy that would not jeopardize the State's legitimate interests. For example, YCJDC could search juveniles

---

**5.** Plaintiffs filed a motion to strike Mr. Vesper's affidavit on the grounds that his testimony relies on hearsay and lacks personal knowledge. (Mot. to Strike (# 67) & Mem. in Supp. of Mot. to Strike (# 68).) Mr. Vesper's affidavit was filed with defendants' Motion for Summary Judgment (# 18) on June 8, 2009. Plaintiff's motion to strike was filed on Janu- ary 15, 2010, seven months after Mr. Vesper's affidavit was filed and over a month after Judge Hubel issued findings and recommendation on defendants' Motion for Summary Judgment. Accordingly, I find that plaintiffs have waived their objections to Mr. Vesper's affidavit, and I DENY plaintiffs' Motion to Strike (# 67).

while they are wearing underwear, could give them a robe or gown, or could perform the mouth, hair, arms, and feet inspection while the children were partially or fully clothed. In the context of adult prisons, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90, 107 S.Ct. 2254.[6]

The existence of less intrusive alternatives is more compelling in the context of a juvenile detention facility than in a prison. Even though the privacy interest of a detained juvenile is less than that of a student, the Constitution still requires some showing that the scope of the search is reasonable in light of a child's acute vulnerability. Here, far from presenting evidence that the scope of a strip search is a reasonable means of furthering institutional security interests, the YCJDC has presented only vague references to "incidents" in which "drugs, contraband and other illegal items" were discovered during strip searches. (*See* Vesper Aff. (# 21) ¶ 9.) Defendants have provided no evidence of what items were discovered, how many items were discovered, where these items were discovered, or even a rough estimate of what percentage of searches result in discovery of some sort contraband. Mr. Vesper never even defines what he means by "contraband and other illegal items." And defendants have been unable to identify a single instance in which contraband has been found in an area that would have been concealed by a juvenile's underwear, as opposed to outer clothing.

The record also shows that Yamhill County could employ less intrusive alternatives without undermining its custodial obligations to care for the health and well-being of juvenile detainees. Although Mr. Vesper notes that the YCJDC strip searches have revealed evidence of abuse, self-harm or medical conditions, he identified only a single instance in which a strip search was necessary to uncover a medical condition hidden by a child's underwear. In that case, the medical condition was "a rash below [a juvenile's] waistline and in his groin and buttocks area," which may or may not have been communicable, and may or may not have posed a serious danger to the child's welfare. (Vesper Aff. (# 21) ¶¶ 11, 14.) Likewise, while defendants note that strip searches allowed YCJDC personnel to identify a skin disease, evidence of self-mutilation, and bruises on some of the named plaintiffs in this case, each of these medical conditions "could have been discovered without a full strip search" because they were visible on the plaintiff's neck, shoulders, or arms. (F & R(# 60) 1253–54.) What is missing from defendants' argument is any evidence to suggest that the scope of the YCJDC strip search policy is "not excessively intrusive in light of the age and sex of the [juvenile detainee] and the nature of the infraction," or, in our case, the nature of the interest justifying the search. *See T.L.O.*, 469 U.S. at 342, 105 S.Ct. 733; *see also Redding*, 129 S.Ct. at 2642–43 (holding a strip search in a school unreasonable in the absence of "any indication of danger to students ... [or] any reason to suppose

---

**6.** Although the Supreme Court has stated that "the logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers," *Wolfish*, 441 U.S. at 559 n. 40, 99 S.Ct. 1861, the Court later held in *Turner* that less intrusive alternatives may be considered as evidence that a prison regulation does not bear a reasonable relationship to penological interests. 482 U.S. at 90–91, 107 S.Ct. 2254 ("This is not a 'least restrictive alternative' test .... [b]ut if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.")

that [the student] was carrying pills in her underwear").

I acknowledge that a juvenile detention facility may find it necessary to strip search juvenile admittees, and I accept that the Constitution permits the facility do so without reasonable suspicion. But the scope of the detention facility's strip search must account both for the need that justifies the search and the acute vulnerability of the searched child. Although general institutional security concerns may justify a detention facility in conducting a brief strip search to inspect for contraband that would be hidden by a child's underwear, a greater showing of need is required to justify keeping a child undressed to conduct an extensive search of areas that can be searched while the child is partially or fully clothed.

Because a strip search is so much more invasive and potentially harmful than other searches, it must be kept within its allowable use. YCJDC can require its youth to strip only when being strip searched, and not at other times. For those portions of the admissions search that do not require full nudity, a strip search is too intrusive. This includes inspection of the scalp, ears, hands, feet, mouth, and nose. It also includes visual inspection that can be performed while the youth is partially clothed or wearing a robe. The availability of less intrusive alternatives to a highly invasive strip search, combined with a lack of evidence that less intrusive alternatives would undermine defendants' legitimate interests, demonstrates that the extensive scope of the YCJDC strip search policy is an exaggerated response to its legitimate institutional concerns. Accordingly, I hold that the YCJDC policy is unconstitutional in its scope.

### VII. *Qualified Immunity*

█ I find Mr. Loewen and Mr. Vesper are granted qualified immunity from suit because it was not clearly established that the strip searches at YCJDC were unconstitutional. A state official is entitled to qualified immunity unless the court finds that the violated constitutional right was "clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *abrogated in part on other grounds by Pearson v. Callahan,* —— U.S. ——, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The Supreme Court has further defined a "clearly established right" as follows:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal citation omitted). As discussed above, neither the Ninth Circuit nor the Supreme Court has addressed the constitutionality of strip searches in juvenile detention facilities. Case law regarding strip searches in schools and adult prisons is not directly transferrable to this context. In juvenile detention facilities, the tension between the state's obligation to act as a guardian, the state's institutional concerns, and the unique constitutional status of children is not currently susceptible to resolution through clearly established rules. As the law now stands, the reasonableness of a strip search in a juvenile detention facility depends almost entirely on the facts specific to each case. Given the novelty of this issue and the fact-specific nature of the reasonableness inquiry, I find that the unconstitutionality of the YCJDC strip

search policy would not have been apparent to defendants. They are therefore entitled to qualified immunity.

## VIII. *Standing*

I agree with Judge Hubel that the YCJDC policy at issue gives rise to conduct "capable of repetition, yet evading review." *See Gerstein v. Pugh*, 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Accordingly, plaintiffs have standing to seek injunctive and declaratory relief.

## CONCLUSION

I adopt Judge Hubel's F & R as my own opinion, to the extent it his analysis is consistent with the views expressed in this opinion and order. Plaintiffs' Motion for Partial Summary Judgment (# 24) is GRANTED IN PART AND DENIED IN PART. Plaintiffs' motion is granted with respect to the constitutionality of the YCJDC policy, and denied with respect to qualified immunity. Defendant's Motion for Summary Judgment (# 18) is GRANTED IN PART AND DENIED IN PART. Defendants' motion is denied with respect to the constitutionality of the YCJDC policy, granted with respect to qualified immunity, and denied with respect to plaintiffs' standing to seek injunctive relief. Plaintiff's Motion to Strike (# 67) is DENIED.

I find resolution of defendants' and plaintiffs' cross-motions for summary judgment involves a controlling question of law as to which there is substantial ground for difference of opinion. I further find an immediate appeal from this order will materially advance the ultimate termination of this litigation. This matter is therefore certified for appeal pursuant to 28 U.S.C. § 1292(b).

IT IS SO ORDERED.

## FINDINGS & RECOMMENDATION

HUBEL, United States Magistrate Judge:

This is an action brought pursuant to 42 U.S.C. § 1983, challenging a strip search policy of the Yamhill County Juvenile Detention Center (YCJDC). The five named plaintiffs seek to represent a class of similarly situated individuals. Defendants are Yamhill County (County), Yamhill County Director Tim Loewen (Loewen), and Yamhill County Division Manager Chuck Vesper (Vesper). Yamhill County, through its Juvenile Department, is responsible for all matters pertaining to the YCJDC. The individual defendants are sued in their official and individual capacities.

Parties have filed cross-motions for summary judgment. For the reasons stated below, I recommend that plaintiffs' partial motion for summary judgment (# 24) be granted in part and denied in part, and defendants' motion for summary judgment (# 18) be granted in part and denied in part regarding the constitutionality of the policy, granted as to qualified immunity, and denied as to standing to assert declaratory and injunctive relief.

## BACKGROUND

Plaintiffs are or were minors charged with petty crimes who were strip searched upon entry into YCJDC and on other occasions, such as after professional visits with counselors and attorneys. Am. Compl. at ¶ 22. They allege that the strip searches were conducted pursuant to a written or *de facto* strip search policy applicable to all juveniles entering YCJDC, regardless of the nature of the crime charged and without reasonable suspicion to believe that a particular juvenile was concealing weapons or contraband. *Id.* at ¶¶ 22, 26.

Plaintiffs seek to bring this suit as a class action, defining the proposed class in the amended complaint as follows:

All persons who have been or will be placed into the custody of the Yamhill County Juvenile Detention Center (YCJDC) after being charged with misdemeanors, violations, civil commitments, non-drug, non-weapon offenses or other minor crimes and were or will be strip searched upon their entry into, and including but not limited to strip searches after contact visits with attorneys and other counselors and professionals in the YCJDC, pursuant to the policy, custom and practice of the Yamhill County Juvenile Detention Department. The class period commences on June 12, 2006 and extends to the date on which Yamhill County is enjoined from, or otherwise cease, enforcing their unconstitutional policy, practice and custom of conducting strip searches absent reasonable suspicion. Specifically excluded from the class are Defendants and any and all of their respective affiliates, legal representatives, heirs, successors, employees or assignees.

Am. Compl. at ¶ 6.

## I. Intake, Admission, and Search Policies

It is undisputed that all juveniles admitted to YCJDC are strip searched. Policy Number 2.1 of the Yamhill County Juvenile Corrections Division Policy and Procedures Manual indicates "the facility uses a uniform intake screening process to determine whether or not a juvenile is to be admitted to Detention or what alternative dispositions and services may be needed." Kraemer Decl., Ex. 3. As a part of the intake screening process, an intake specialist completes an intake report which includes the juvenile's name, age, allegation, date, time and referring agent. *Id.* Additionally, intake counselors gather information including "all charges, traffic citations, contraband that was not confiscated by police or staff, information given by the police that was not specific to the current charges, allergies, medical concerns, demeanor of the youth, attitude of parents, and so on." *Id.* Policy Number 2.3 sets forth the admission criteria for YCJDC:

1. Part One: At least one of the following must have occurred:

 a. Judge/Referee issues a verbal or written order to detain.

 b. Circuit Court statewide or nationwide warrant.

 c. The youth has violated conditions of probation as ordered by a Yamhill County Court.

 d. The youth has violated the conditions of a Yamhill County Court/Juvenile Department Conditional Release.

 e. The youth allegedly committed a felony crime.

 f. The youth allegedly was in unlawful possession of a firearm.

 g. The youth allegedly committed the offense of Criminal Manufacture or Delivery of a Controlled Substance.

 h. The youth allegedly committed a misdemeanor crime resulting in physical injury.*

 i. The youth is a fugitive from another jurisdiction.*

 j. The juvenile has willfully failed to appear at one or more juvenile court proceeding by having disobeyed a proper summons, citation or subpoena.*

 * require Juvenile Department Director or designee approval.

2. Part Two: In addition to the above, at least one of the following must apply:

 a. No means less restrictive of the youth's liberty gives reasonable

assurance that the youth will attend the adjudicative hearing.

b. The youth's behavior endangers the physical welfare of the youth or another person, or endangers the community.

*Id.*, Ex. 2.

Once a juvenile is admitted, they are subject a strip search, as set forth by Policy Number 3.4, which prescribes the following steps for conducting a search[1]:

All juveniles admitted to the Yamhill County Juvenile Detention Facility are strip searched for contraband.

All strip searches are conducted in an area and manner which insures the privacy and the dignity of the individual being searched.

No juvenile is subjected to an internal search of his/her anus or vagina.

1. Escort the youth to an area that affords him privacy while the search is performed. Instruct the youth to remove each article of clothing and hand the article of clothing to the staff performing the search. The staff inspects each article of clothing for contraband.

2. Once the youth has disrobed, instruct the youth to face the staff. Staff makes an initial top to bottom observation of the youth at this time. This includes the entire front of the body to include the tops of the feet.

3. Instruct the youth to tilt his head forward (and down) and run his fingers through his hair. Staff insure that the youth's head is far enough forward and down for the staff to see behind the youth's ears. (The youth should be instructed to move his hair out of the way of the back of the ears if necessary.)

4. Instruct the youth to stand facing staff and open their mouth wide. Staff instructs the youth to use his fingers and lift his upper lip and then lower his lower lip to allow staff to see clearly between his lips, cheeks, and teeth. The youth is then instructed to run his fingers between his teeth and gums all the way around his mouth; top and bottom. Staff completes the search of the mouth by instructing the youth to lift his tongue while the staff looks under it. The youth is then directed to blow each nostril; one at a time.

5. The youth is then told to hold their hands out, palms facing staff, with his fingers apart. After inspecting the palm side, staff instructs the youth to turn his hands so staff can observe the backs of his hands.

6. The youth is instructed to lift his arms high enough to allow staff to inspect the youth's arm pits.

7. The youth is instructed to lift his scrotum so that staff can inspect the area directly below the testicles. If the youth is uncircumcised, he is instructed by staff to pull back the foreskin so that the area beneath the foreskin can be inspected.[2]

8. Staff then instructs the youth to turn around, place their hands on a wall (or structure capable of helping the youth maintain their balance). Staff should make an initial top to bottom observation of the back of the youth's body.

9. Staff then instructs the youth to lift his right foot so staff can inspect the bottom of that foot. The youth is instructed to wiggle his toes. Next, the

---

1. The policy includes separate search procedures for male and female juveniles, which are virtually identical, except as noted. In the interest of brevity, I am only including the procedures for males.

2. For females, this step instructs: "the youth is instructed to lift her breasts so that staff can inspect the area directly below."

same procedure is followed for the left foot. The youth is instructed to squat, bending his legs at the knees and as far down as possible. The youth is then instructed to cough.[3] Upon completion of these steps and if no contraband is found the youth is instructed to re-dress. 10. If any contraband is found it should be confiscated, a second staff called to the area where the strip search is being performed, and the search started over. Upon completion of the second search, the youth is issued new clothing.

Berman Decl., Ex. 1.

## II. Subsequent Search Policies

In addition to the policy described above, YCJDC has a policy authorizing strip searches of juveniles after contact visits with a non-Juvenile Department staff member. Supp. Loewen Aff., at ¶ 6. Policy Number 6.1 outlines visitation procedures for juveniles housed at YCJDC. *Id.* at ¶ 5. After intake, juveniles are afforded two types of visits: professional visits and personal visits. *Id.* A professional visit includes meetings between the juvenile and their attorney, mental health counselors, or other professionals who are non-Juvenile Department staff members. *Id.* These visits generally take place in the Interview Room, which is an open room permitting contact between the juvenile and the visitor. *Id.* A personal visit includes all non-professional visitors such as parents, guardians, or other adults authorized to visit the juvenile. *Id.* at ¶ 8. These visits are non-contact visits, as they take place in the Visiting Room which separates the juveniles and visitors by a glass partition. *Id.*

Policy Number 6.5 authorizes strip searches of all juveniles after contact visits with a non-Juvenile Department staff member. *Id.* at ¶ 6. The purpose of the policy is to prevent the introduction of weapons, drugs, or other contraband into the facility. *Id.* at ¶ 7. There is no policy authorizing strip searches of juveniles after non-contact visits, such as those with parents or guardians. *Id.*

## III. Strip Searches of Individual Plaintiffs

Plaintiff Nathanael Williams was arrested on June 15, 2006, on charges of Robbery 3, Theft 3, Minor in Possession of Alcohol, Criminal Trespass, and Harassment, and booked into the YCJDC. Am. Compl. at ¶ 44. He was also arrested on August 3, 2006, for Minor in Possession of Tobacco, Nighttime Curfew Violation, and Criminal Trespass, and booked into the YCJDC. *Id.* On both occasions, he was subjected to strip searches after transport to the YCJDC. *Id.* at ¶¶ 45–46.

Plaintiff Amy Hinmon was arrested on November 2, 2006, on charges of Failure to Appear on Minor in Possession and Contempt charges for Failing to Complete Evaluation, and booked into the YCJDC. *Id.* at ¶ 34. Over the course of the next six days, Hinmon was strip searched four times, after transport to YCJDC and after meetings with attorneys. *Id.* at ¶¶ 35–36.

Plaintiffs CM and RC were arrested on February 22, 2007, on charges of Sexual Abuse in the First Degree, and booked into the YCJDC. *Id.* at ¶ 29. Over the course of the next five days, CM was strip searched five times, and RC eight times, after transport to the YCJDC and after meetings with counselors and attorneys. *Id.* at ¶¶ 30–31.

Plaintiff Joseph Lewis was arrested on September 4, 2007, on charges of Encour-

---

**3.** For females, the sentences regarding the instructions to squat and cough are identical, but are included in step seven.

aging Child Pornography, and booked into the YCJDC. *Id.* at ¶ 39. He was subjected to a strip search after transport to the YCJDC. *Id.* at ¶¶ 40–41. Plaintiff Lewis had a prior arrest for Carrying a Concealed Weapon. Kraemer Aff. at ¶ 7, Ex. 5.

## STANDARDS

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995). A genuine dispute arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *State of California v. Campbell,* 319 F.3d 1161, 1166 (9th Cir.2003). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court may not make credibility determinations or weigh the evidence. *Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 554–55, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Ins. Co. of N. Am.,* 638 F.2d 136, 140 (9th Cir.1981).

## DISCUSSION

Plaintiffs bring this action under 42 U.S.C. § 1983, alleging that the enforcement of the County's strip search policies violated their Fourth Amendment rights. Am. Compl. at ¶¶ 49–58. They seek a declaration that the policies are unconstitutional, an injunction against their continued enforcement, and damages. *Id.* at ¶¶ 59–66.

Both parties' motions for summary judgment center upon the constitutionality of the strip search policies. Plaintiffs' motion address only the first claim for relief, arguing that the "blanket" nature of the policies make them unconstitutional. Defendants move for summary judgment on the grounds that the policies are constitutional, named defendants are entitled to qualified immunity, and plaintiffs do not have standing to assert claims for injunctive and declaratory relief.

## I. Constitutionality of Strip Search Policy

### A. Legal Standard

█ Plaintiffs assert that defendants' policies of routinely strip searching detained juveniles violates the Fourth Amendment of the United States Constitution which provides in pertinent part, "the right ... against unreasonable searches and seizures[.]" U.S. Const. amend. IV. The Fourth Amendment's protection against unreasonable searches requires a "balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Courts must consider the "scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted." *Id.* The more intrusive the search, the more justification necessary. *Terry v. Ohio,* 392 U.S. 1, 18 n. 15, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

█ It is well established that a policy of routinely strip searching adults arrested for minor offenses violates their constitu-

tional rights because the need to conduct such an intrusive search is not sufficient to justify such a serious intrusion into an individual's privacy. *Giles v. Ackerman,* 746 F.2d 614, 615–19 (9th Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985); See *also Ward v. County of San Diego,* 791 F.2d 1329, 1332 (9th Cir.1986); *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). However, a "search unsupported by probable cause may be reasonable when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Bd. of Educ. v. Earls,* 536 U.S. 822, 829, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (internal quotations omitted). To determine whether a situation justifies a search without individualized suspicion, courts must engage in "a fact-specific balancing of the intrusion ... against the promotion of legitimate government interests." *Id.,* 536 U.S. at 830, 122 S.Ct. 2559. The "special needs" doctrine has permitted searches without warrants in hospitals, government agencies, and to drug test students participating in extracurricular activities and school athletics. *See N.G. v. Connecticut,* 382 F.3d 225, 231 (2nd Cir.2004).

■ Courts have long recognized that when the state is "exercising some legitimate custodial authority over children, its responsibility to act in the place of parents [*in loco parentis* ] obliges it to take special care to protect those in its charge, and that protection must be concerned with dangers from others and self-inflicted harm." *Id.,* 382 F.3d at 232. Accordingly, a "juvenile's liberty interest may, in appropriate circumstances, be subordinated to the State's [*in loco parentis* ] interest in preserving and promoting the welfare of the child." *Id.,* (citing *Schall v. Martin,* 467 U.S. 253, 265, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984)) (citations omitted). At the same time, juveniles are especially likely to be vulnerable to the adverse effects of a strip search. *Id.*

The Supreme Court has not directly addressed the issue of strip searches of juveniles in detention facilities. However, the Court recently invalidated a strip search of a student at school, despite the existence of reasonable suspicion to suspect that the student was distributing contraband drugs because a search "will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Safford Unified School District # 1 v. Redding,* —— U.S. ——, 129 S.Ct. 2633, 2639, 174 L.Ed.2d 354 (2009). In so finding, the Court noted that Fourth Amendment standards are "fluid concepts that take their substantive content from the particular contexts" in which they are being assessed. *Id.,* 129 S.Ct. at 2639 (citing *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).

While schools and detention centers both have a duty to act *in loco parentis* when it comes to the juveniles in their care, there are differences that make analogizing the rules that dictate permissible governmental intrusion difficult. *See N.G.,* 382 F.3d at 233 (distinguishing the Seventh Circuit's decision in *Doe v. Renfrow,* 631 F.2d 91, 92–93 (7th Cir.1980), regarding a strip search because the search occurred in a school and the juvenile was "not confined in a detention facility"). At least once court has observed that "the situation of [a juvenile detention facility] lay somewhere between that of prison inmates and students in school." *Reynolds v. City of Anchorage,* 379 F.3d 358, 364 (6th Cir.2004). A critical distinction from schools is that youth confined in a juvenile detention facility are "under substantially greater restraint and ha[ve] a

lesser expectation of privacy than do students." *Id.*

The Ninth Circuit has not directly addressed the issue of strip searches of juveniles in detention centers, so the court must look for guidance to those few cases that have addressed similar issues. The Eighth Circuit recently upheld a search of a juvenile upon admission to a detention facility because the state's legitimate interest to "act *in loco parentis* with respect to juveniles in lawful state custody" outweighed the invasion of personal privacy, primarily because the search was not a full strip search, as the juvenile was not asked to remove her undergarments. *Smook v. Minnehaha County,* 457 F.3d 806, 811–812 (8th Cir.2006).

Similarly, the Sixth Circuit upheld a search of a strip search of a juvenile housed in a group home after a delinquency adjudication because the facility had a strong interest in preventing drug use on the premises, the officer's strip search was "not unreasonable," the search was "no more invasive the necessary," and "it was conducted in a way designed to minimize the intrusive effect." *Reynolds,* 379 F.3d at 365. In so finding, the court emphasized the facility's "duty and responsibility to insure the safety, health, and well-being" of the juveniles in its custody, as well as the specific facts giving rise to the suspicion that the juvenile was in possession of drugs at the time of the search. *Id.,* 379 F.3d at 364.

Finally, the Second Circuit found that, while it was a "close question," full strip searches conducted upon intake at a juvenile detention center were constitutional because the state had legitimate interests in performing the searches because: (1) the state has an "enhanced responsibility to take reasonable action to protect [children] from hazards resulting from the presence of contraband where children are confined;" (2) a strip search "serves the protective function of locating and removing concealed items that could be used for self mutilation or even suicide;" and (3) a strip search may "disclose evidence of abuse that occurred in the home, and awareness of such abuse can assist juvenile authorities in structuring an appropriate plan of care." *Smook,* 457 F.3d at 811 (citing *N.G.,* 382 F.3d at 236). However, the court in *N.G.* found subsequent strip searches unconstitutional, such as those following transfer from one facility to another, or that occurred after the disappearance of pencils inside the facility, absent reasonable suspicion that a juvenile had obtained contraband. 382 F.3d at 233–34.

While not in the context of a juvenile detention facility, the Eleventh Circuit has held that strip searches of juveniles at a police station after being arrested for minor offenses may be constitutionally permissible, so long as they are based upon reasonable, individualized suspicion. *Justice v. City of Peachtree City,* 961 F.2d 188, 193 (11th Cir.1992). In so finding, the court recognized that strip searches are "valuable law enforcement tools" in identifying the security dangers inherent in a detention center. *Id.* However, given the "degrading and frightening" nature of strip searches and the potential for serious trauma to juveniles, the court must determine whether law enforcement officers "based on the totality of the circumstances, had a particularized and objective basis" for the search. *Id.,* 961 F.2d at 192, 194.

In contrast, two California district courts have declared unconstitutional blanket strip search policies. In the most recent decision, the district court rejected the government's justification that the searches were necessary to recover contraband and protect the safety of the youth in custody because juveniles admitted to the detention facility were generally charged

with serious crimes. *Moyle v. County of Contra Costa,* 2007 WL 4287315 at \*11–12 (N.D.Cal. Dec. 5, 2007). The court reasoned that these justifications did not justify the severely invasive, full strip search policy of juveniles upon admission and after visits with non-Juvenile Department staff such as probation counselors, parents, and attorneys. *Id.* The court specifically pointed out that defendants presented no evidence that "contraband ... was seized from juveniles ... whose crime did not involve violence, drugs, or weapons," and that such contraband could have been detected through less intrusive means, such as through the use of pat-downs or metal detectors. *Id.* Similarly, a district court determined that the government's interest in maintaining security did not justify routine full strip searches of juveniles admitted to an INS detention facility who were not charged with any criminal offense. *Flores v. Meese,* 681 F.Supp. 665, 667–669 (C.D.Cal.1988).

### B. Analysis

Given the above framework, I first consider the nature of the intrusion on the juveniles' privacy. Here, the policies at issue involve a full strip search of juveniles upon their admission to YCJDC and after contact visits with non-Juvenile Department staff, without any requirement for reasonable suspicion to suspect the juvenile possesses contraband. Strip searches with body cavity inspections have "instinctively" given the Supreme Court "the most pause." *Wolfish,* 441 U.S. at 558, 99 S.Ct. 1861, *N.G.,* 382 F.3d at 233. Such searches are "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." *Mary*

*Beth G. v. City of Chicago,* 723 F.2d 1263, 1272 (7th Cir.1983). Full strip searches can be especially traumatic for juveniles, as "youth is a time and condition of life when a person may be most susceptible to influence and psychological damage." *Eddings v. Oklahoma,* 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

Here, the strip searches authorized by the policies are highly intrusive, as the juveniles are completely unclothed for inspection by a stranger, are required to manipulate either their breasts or scrotum for inspection, and to squat and cough.[4] They are not permitted to wear a robe or otherwise cover themselves during the search.

Against this intrusion, I next examine the evidence presented by defendants in support of the policy. First, it is clear no individualized analysis of the need for a strip search on initial detention is made for each juvenile. If they are detained, they are strip searched. The governmental interests alleged by defendants to justify their strip search policy are: (1) to prevent the introduction of weapons or contraband into the facility, (2) to discover hazards to health or safety that may go unnoticed during the intake screening process, and (3) to remove items of clothing that might be used to inflict self injury. Vesper Aff. at ¶ 7. The evidence offered by defendants indicates that searches of juveniles have indeed discovered drugs and other contraband, and revealed abuse, self-harm, and medical conditions that might otherwise have gone undetected. *Id.* at ¶¶ 8–14. Between 2004 and 2008, 1 in 5 searches revealed such evidence. *Id.* at ¶ 11. Specifically in regard to the individual plain-

---

4. Plaintiffs initially claimed that they were also required to "spread the lobes of [their] buttocks" for a visual inspection of the rectal cavity, in contravention of the written policy, which indicates that juveniles are instructed only to squat and cough. However, plaintiffs have withdrawn any dispute as to the manner of searches conducted from consideration at this time. Pls.' Resp. to Defs.' Supp. Brief. (# 59), at p. 8.

tiffs, defendants provide evidence of a skin disease discovered on CM, bruises related to a low blood pressure problem on Hinmon, and burn scars on Williams, which ultimately revealed self-abuse and placement in an "Imminent Risk" category, requiring more intense supervision so he didn't harm himself. Kramer Aff. at ¶¶ 8–12, Ex. 6–10.

Plaintiffs challenge defendants' evidence by asserting that defendants have not presented a contraband log documenting that any contraband that has been found as a result of the searches, and there is no evidence that the searches have ever recovered contraband or evidence of abuse in a juvenile's intimate areas. Pls.' Resp. to Defs.' Supp. Brief, at p. 5. Furthermore, plaintiffs point out that all the medical and physical problems pointed to by defendants could have been discovered without a full strip search. *Id.* Specifically, the skin disease discovered on CM was visible from his neck and shoulders, and the burns to Williams were on his hands, arms, stomach, and legs, and could have been detected without removal of his undergarments. *Id.*

Plaintiffs further contend that the staff at YCJDC did not have reasonable suspicion to conduct strip searches. In cases not involving juveniles, reasonable suspicion sufficient for a strip search has been found based upon the nature of the offense, the arrestee's appearance and conduct, and prior arrest record. *Giles,* 746 F.2d at 617. Furthermore, the Ninth Circuit has held that even if no actual evidence of violence is associated with an arrest, charges that are "sufficiently associated with violence" can justify a visual strip search. *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1447 (9th Cir.1989)(finding a charge of grand theft auto sufficiently associated with violence to justify a strip search); *See also Miller v. Yamhill County,* 620 F.Supp.2d 1241, 1247 (D.Or.2009)(same, for a charge of resisting arrest); *Dobrowolskyj v. Jefferson County,* 823 F.2d 955, 957–59 (6th Cir.1987)(same, for a charge of menacing); *Dufrin v. Spreen,* 712 F.2d 1084, 1089 (6th Cir. 1983)(same, for a charge of assault). Similarly, charges that arise from illegal drugs would provide a basis for a strip search because the very nature of the charge is reasonably related to the security of the facility, specifically to be free of contraband. *Kennedy v. Los Angeles Police Department,* 901 F.2d 702, 716 (9th Cir.1989).

Defendants' argument suggests that while they make no separate, post detention decision to strip search a detained juvenile, the defendant has considered the relevant factors in that regard in the process of making the detention decision. It is important to note that the nature of the offense is merely one of the factors that may provide the individualized suspicion to justify a strip search. While defendants primarily rely upon the nature of the charges and prior arrest records of the plaintiffs[5] to justify the strip searches conducted at admission, they also offer their intake screening process and admission criteria as evidence of additional factors taken into consideration during the admission process. Kraemer Aff., Ex. 2–3. It gathers information regarding the juvenile's medical and criminal history, whether the juvenile has a history of abuse or suicide, and the circumstances surrounding the immediate arrest, including the juvenile's demeanor. *Id.,* Ex. 3.

While defendants have provided no evidence logs documenting that contraband was ever discovered in a youth's genital

---

5. With the exception of plaintiff Hinmon, each of the named plaintiffs was charged with a crime that included an element of force or had a criminal history that included such a charge.

areas, or that the revelation of medical issues was discovered only after conducting a full strip search, this is not enough to invalidate the search policy. Courts have struggled with how to strike the balance between conducting a highly invasive search and the need to maintain institutional security, and what evidence is necessary to justify a policy. *See Reynolds,* 379 F.3d at 364–65. However, only one court has explicitly addressed the adequacy of evidence contained in so called "contraband logs," while the others have been able to evaluate the justifications for the policy without such evidence. *See Moyle,* 2007 WL 4287315 at *11–12. Therefore, the failure of defendants to provide the court with such evidence is not determinative of whether their strip search policy upon admission is justified.

Given the intake screening process, the detailed admission criteria, and the proffered rationale for the county's strip search policy, I find that, in regard to the searches conducted at admission, the policies in place do not violate the Fourth Amendment.

 However, with respect to searches performed after contact visits,[6] there is no evidence in the record supporting any justification for the searches, other than the argument that the searches were necessary to maintain security and prevent the introduction of contraband. The Second Circuit, in analyzing subsequent searches of juveniles in detention, noted that "whatever the justification for strip searches upon initial admission ... we see no state interest to warrant repeated strip searches[.]" *N.G.,* 382 F.3d at 233. The court went on to point out that the ability of the facility to maintain constant surveillance of the juveniles in its custody and the

availability of other search techniques, "renders unreasonable a subsequent strip search in the absence of reasonable suspicion of contraband." *Id.,* 382 F.3d at 234.

Here, while I recognize that it is possible that a juvenile could obtain contraband or pick up a seemingly innocuous item during a contact visit that could be later used to harm themselves or others, this possibility, without more, is too remote to justify the serious intrusion of a strip search after every contact visit. Also relevant is the fact that juveniles are only permitted contact visits with professionals such as attorneys and mental health counselors. Supp. Loewen Aff., at ¶ 5. The restriction of contact visits to professionals with no personal connection to the youth significantly decreases the likelihood that contraband would enter the facility during such a visit. The medical condition or potential abuse justification has no apparent role in strip searches after contact visits. While I do not discount the purpose of protecting juveniles in YCJDC custody, the policy authorizing strip searches after every contact visit is unreasonable in the absence of reasonable suspicion that a particular juvenile has obtained and concealed contraband after a contact visit.

## C. Conclusion

After assessing all of the circumstances, including the important need for the state to protect the youth in its care and insure institutional safety, and the potential risks to the psychological well-being of juveniles subjected to full strip searches, I conclude that the strip searches conducted upon admission do not violate Fourth Amendment standards. However, searches conducted after contact visits, absent any rea-

---

**6.** At oral argument, plaintiffs' counsel briefly referred to strip searches allegedly performed after non-contact visits with family members. However, there is no evidence anywhere in the record that plaintiffs are alleging that they were strip searched after non-contact visits. Accordingly, the court will only address those searches after contact visits.

sonable basis to suspect that the juveniles have obtained and hidden contraband, violate the Fourth Amendment. Therefore, I recommend that the defendants' motion for summary judgment be granted in regard to the constitutionality of the admission search policy, and denied in regard to the contact visit search policy. Similarly, I recommend that plaintiffs' motion for summary judgment be granted in regard to the constitutionality of the contact visit search policy, and denied in regard to the admission search policy.

## II. Qualified Immunity for Named Defendants

Defendants argue that in the event the court determines that the strip search policies involved in this action are unconstitutional, defendants Loewen and Vesper are entitled to qualified immunity. An official may only be held personally liable for an allegedly unlawful official action if the right at issue was "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Qualified immunity analysis must be undertaken looking at "the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The qualified immunity inquiry has traditionally involved two prongs. First, the court must decide whether the plaintiff has shown that a constitutional or statutory right has been violated. *Id.*, 533 U.S. at 201, 121 S.Ct. 2151. If the first step is satisfied, the court must then decide whether the right at issue was "clearly established" at the time of the alleged violation. *Id.*

However, the Supreme Court recently held that lower courts are no longer required to address the prongs in order, and may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, —— U.S. ——, 129 S.Ct. 808, 818, 172 L.E.2d 565 (2009). Despite the Supreme Court's grant of discretion to the trial court to decide which prong of the qualified immunity analysis to address first, I have adhered to the *Saucier* rubric. The only constitutional violation at issue involves the strip searches after contact visits. The remaining issue is whether the right to be free of strip searches after contact visits absent reasonable suspicion was "clearly established" at the time the proposed class period began.

 Plaintiffs allege that the written policy of strip searching juveniles admitted to the YCJDC is a violation of the Fourth Amendment. As of June 12, 2006, the date in which plaintiffs begin their proposed class, no Supreme Court or Ninth Circuit case had addressed the issue of strip searches of juveniles in detention centers. The Ninth Circuit had clearly established that strip searches of adult offenders charged with minor offenses, absent reasonable suspicion, was unconstitutional, but these cases did not consider the special interests involved concerning juveniles. While *Flores*, decided in 1988, dealt with strip searches of juveniles in detention centers, that case does not directly bear upon the issue at hand, as it dealt solely with strip searches of juveniles that were not charged with any criminal offense. 681 F.Supp. at 668. The only other Ninth Circuit case addressing the issue was an unreported district court case, which was decided in December 2007, long after the proposed class period began. *Moyle*, 2007 WL 4287315. Therefore, I conclude there was no Ninth Circuit case law, prior to June 12, 2006 that clearly established that the YCJDC strip search policy was unconstitutional.

Nor was there adequate precedent from other federal circuits clearly establishing the law with respect to juvenile detention strip search policies. While the 1992 Eleventh Circuit decision in *Justice,* addressed a blanket strip search policy as it applied to juveniles, that case is distinguishable because it concerned youth lodged at a jail, rather than booked into a juvenile detention center, thereby failing to adequately take into account the special needs that arise when the state must act *in loco parentis.* 961 F.2d at 193. The Second Circuit was the first circuit to directly address the reasonableness of such policies, in a case decided in September 2004, well before the proposed class period began. There, the court engaged in a highly fact specific inquiry, ultimately finding that absent reasonable suspicion, the searches upon entry were lawful, but that subsequent searches while the juveniles remained in custody were unlawful absent reasonable suspicion contraband had been obtained. *N.G.,* 382 F.3d at 233–237. The subsequent searches in *N.G.* were not restricted to contact visits. Also in March 2004, the Sixth Circuit upheld a strip search in a juvenile group home because there existed reasonable suspicion to conduct the search given the specific circumstances that formed the officer's basis to suspect that the juvenile possessed contraband. *Reynolds,* 379 F.3d at 364–65. The Eighth Circuit is the only other circuit to have taken up the issue, in *Smook,* decided on August 9, 2006, two months after the proposed class period began. 457 F.3d at 806.

Furthermore, it is important to note that as recently as June of this year, the Supreme Court observed that, even in the context of strip searches in schools, where there was applicable precedent from the Supreme Court, "the cases viewing school strip searches differently from the way we see them are numerous enough ... to counsel doubt that we were sufficiently clear in the prior statement of the law." *Safford Unified School District # 1,* 129 S.Ct. at 2644. Unlike the school searches addressed in *Safford Unified School District # 1,* there is no controlling precedent that has directly addressed the application of the Fourth Amendment to strip searches of juveniles in detention centers. In fact, those appellate courts that have addressed the issue have commented on the novelty of the issues presented. *See Smook,* 457 F.3d at 810–11; *N.G.,* 382 F.3d at 233; *Reynolds,* 379 F.3d at 367.

Therefore, given the lack of directly controlling and relevant precedent, I find that at the time the proposed class period commenced, June 12, 2006, it was not clearly established that the YCJDC post contact visit strip search policy was unconstitutional, thereby entitling Loewen and Vesper to qualified immunity for post-contact visit searches. I recommend granting the motion for summary judgment, as it applies to defendants Loewen and Vesper in their individual capacities.

III. Standing to Assert Declaratory and Injunctive Relief

▪▪▪▪ Defendants assert that declaratory and injunctive relief is not available to plaintiffs because they cannot establish the standing necessary to assert such claims. Where injunctive and declaratory relief is sought, the allegations must demonstrate that plaintiff faced a "real and immediate" threat of direct injury as a result of the challenged official conduct. *City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). In order to assert claims on behalf of a class, a named plaintiff has standing to seek injunctive relief where the harm is "directly traceable to a written policy," or that the harm is part of a "pattern of officially sanctioned behavior." *Armstrong v. Davis,* 275 F.3d 849, 861 (9th

Cir.2001) (citing *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir.2001); *LaDuke v. Nelson*, 762 F.2d 1318, 1323 (9th Cir. 1985)). In the only applicable case in this circuit addressing strip searches of juveniles in detention centers, the court found that plaintiffs had standing to seek injunctive relief even after the policies were changed after litigation commenced, for several reasons. *Moyle*, 2007 WL 4287315 *14. In so finding, the court noted that the challenged policy applied to all juveniles admitted to the detention facility, that at the time the action commenced, plaintiffs "faced a real and immediate threat of being subjected to a strip search again," and the change in policy had been "accompanied by continued assertions that [the prior policy] was constitutional." *Id.*

■ Here, plaintiffs challenge an established practice under which all juveniles are strip-searched upon admission to YCJDC and after contact visits with non-Juvenile Department staff. The written policy was in effect at the time the litigation commenced, and is currently still in effect. Thus, the individual plaintiffs and the class they seek to represent face a real and immediate threat of being subjected to a strip search again. Finally, while some of the named plaintiffs have attained the age of majority, this does not render the claim moot because plaintiffs' claim is not asserted only on their own behalf. Rather, plaintiffs represent a purported class that may be detained at YCJDC and subsequently subjected to the challenged strip search. Therefore, this case falls within "that narrow class of cases in which the termination of a class representative's claim does not moot the claims of the unnamed members of the class" because the claim is distinctly "capable of repetition but evading review." *Gerstein v. Pugh*, 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *see Moyle*, 2007 WL 4287315 *15. Accordingly, I find that plaintiffs have standing to assert their claims for declaratory and injunctive relief.

## CONCLUSION

I recommend that plaintiffs' partial motion for summary judgment (# 24) be granted in part and denied in part, and defendants' motion for summary judgment (# 18) be granted in part and denied in part regarding the constitutionality of the policy, granted as to qualified immunity, and denied as to standing to assert declaratory and injunctive relief. Should the recommendation be followed, the remaining issues are: 1) class certification; 2) appropriate declaratory and injunctive relief; and 3) what type of monetary damages are appropriate in this case.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due December 24, 2009. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due January 11, 2010. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.